ARNOLD T. FORSETH, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 27126–82, 1685–83,    Filed July 30, 1985.
7702–83, 7703–83,
32763–83, 2544–84,
3346–84.

---

[1]Cases of the following petitioners are consolidated herewith: Gerald R. Formsma and Constance Y. Formsma, docket No. 1685–83; Stephen A. Mahoney III and Mary Ann Mahoney, docket No. 7702–83; Richard H. Bramblett and Patsy J. Bramblett, docket No. 7703–83; David C. Enrici and Marianne Enrici, docket No. 32763–83; Raymond Wooldridge and Ida Wooldridge, docket No. 2544–84; Lawrence H. Easterling, Jr., and Phyllis R. Easterling, docket No. 3346–84.

*Edward G. Lavery* and *Larry K. Hercules*, for the petitioners.
*William P. Hardeman*, for the respondent.

KÖRNER, *Judge*: Respondent determined deficiencies in Federal income taxes plus additions to tax against petitioners in these cases as follows:

| Petitioners | Docket No. | Taxable year | Deficiency | *Additions to tax* sec. 6653(a)[2] |
|---|---|---|---|---|
| Arnold T. Forseth[3] | 27126–82 | 12/31/80 | $18,664.00 | $933.00 |
| Gerald R. Formsma and Constance Y. Formsma | 1685–83 | 12/31/80 | 40,335.00 | 2,016.75 |
| Stephen A. Mahoney III and Mary Ann Mahoney | 7702–83 | 12/31/80 | 21,267.00 | |
| Richard H. Bramblett and Patsy J. Bramblett | 7703–83 | 12/31/80 | 60,708.85 | 3,035.44 |
| David C. Enrici and Marianne Enrici | 32763–83 | 12/31/80 | 452,509.00 | |
| Raymond Wooldridge and Ida Wooldridge | 2544–84 | 12/31/80 | 32,201.00 | |
| | | 12/31/81 | 43,286.00 | |
| Lawrence H. Easterling, Jr., and Phyllis R. Easterling[4] | 3346–84 | 12/31/80 | 65,692.00 | 3,285.00 |

After concessions, the issues remaining for decision are: (1) Whether petitioners are entitled to deduct losses resulting from the dispositions by a corporate entity in London known as L.M.E. Investments, Ltd., and its successor, L.M.E. Commodities, Ltd., of certain alleged positions in forward contracts in gold and platinum; (2) whether petitioners Formsma,

---

[2]All statutory references herein are to the Internal Revenue Code of 1954 as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

[3]By answer filed Jan. 10, 1983, respondent asserted an additional deficiency and addition to tax against petitioner Forseth in the respective amounts of $885 and $45.

[4]By amended answer filed on May 25, 1984, respondent claimed an additional deficiency against petitioners Easterling, in an unspecified amount, relative to their claimed business expense deduction for a fee of $4,500 paid to an entity known as InterAct Trading Corp.

Mahoney, Enrici, Wooldridge, and Easterling are entitled to deduct certain fees paid to InterAct Trading Corp. relative to such transactions; and (3) whether petitioners Forseth, Formsma, Bramblett, and Easterling are liable for the foregoing additions to tax for negligence.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

As of the dates of filing their petitions herein, petitioners resided in the following locations:

| Petitioners | Docket No. | Residence |
|---|---|---|
| Forseth | 27126–82 | Waukesha, Wisconsin |
| Formsma | 1685–83 | Elkhart, Indiana |
| Mahoney | 7702–83 | Cleveland Heights, Ohio |
| Bramblett | 7703–83 | Dallas, Texas |
| Enrici | 32763–83 | Orinda, California |
| Wooldridge | 2544–84 | Atlanta, Georgia |
| Easterling | 3346–84 | Redwood City, California |

In each case, petitioners timely filed individual income tax returns, Forms 1040, with the Internal Revenue Service for the years in issue, using the cash method of accounting. For such years, all petitioners filed in married filing joint return status, except for petitioner Forseth, who filed in married filing separate return status.[5]

L.M.E. Investments, Ltd. (hereinafter LMEI) was a commodity brokerage firm formed in 1972 by Paul Martin, who was its owner and director, and James Gourlay, who may have had an ownership interest in the company. Both men had previously been associated with Rudolf Wolff & Co., a London brokerage firm dealing in commodity transactions on the London Metal Exchange, a recognized international market in nonferrous metals which had been in existence for over 100 years. However, LMEI was a private corporate entity, in no way related to the London Metal Exchange. When Martin and

---

[5]Petitioners Constance Y. Formsma, Mary Ann Mahoney, Patsy J. Bramblett, Marianne Enrici, Ida Wooldridge and Phyllis R. Easterling were joined in this matter because they filed joint returns with their respective petitioner-spouses for the years in issue. As used herein, "petitioner" followed by the surname, refers to the male petitioner, and "petitioners" followed by the surname, refers to both.

Gourlay formed LMEI, they took with them Paul Gleeson, an employee of Rudolf Wolff & Co., who assisted them at LMEI in placing orders, servicing clients, and keeping records.

In February of 1980, Paul Martin died. In or about May of 1981, as a result of the administration of Martin's estate, LMEI was liquidated, and a successor corporation named L.M.E. Commodities (hereinafter LMEC) was formed to carry on essentially the same business for the same accounts. The ownership and directorship of the successor corporation were assumed by Gourlay (for convenience, LMEI and LMEC are hereinafter collectively referred to, where appropriate, as LMEI/LMEC).

At a meeting of financial planners in California in 1980, Paul Gleeson met Robert Ketron, who was at that time a professional geographer. While he had no prior experience trading in commodities, Ketron had recently developed an interest in world commodity markets in an effort, as he stated, to "expand my horizons to meet the challenging times * * * ahead." At Gleeson's invitation, Ketron traveled to London to observe and evaluate LMEI's operations.

After his return from London, Ketron was involved in the formation of a corporation known as InterAct Trading Corp. (hereinafter InterAct), in which he was a 50-percent shareholder. InterAct's literature described the corporation as "a Cleveland-based advisory firm which provides informational services as to how to contact broker-traders who deal in metals in foreign markets."

After the formation of InterAct, Ketron, acting on behalf of the corporation, employed the services of a certified public accountant named Robert Warshawsky to evaluate the operations of LMEI. At Ketron's request, Warshawsky traveled to London in November of 1980, where he met with a number of LMEI's employees, including Gleeson and Gourlay, and inspected its computer system and certain of its records.

In an effort to verify that certain commodity trades were actually being made by LMEI, Warshawsky inspected certain warehouse receipts, but he neither inspected any documentation respecting trades in gold or platinum, nor made any effort to verify that LMEI was "laying off" its contracts, as described *infra*, with third parties.

Warshawsky's examination of LMEI failed to provide a basis for him to evaluate the bona fides of its straddle transactions in gold and platinum forward contracts. However, in a letter dated November 24, 1980, reporting on the results of his examination of LMEI to Ketron, Warshawsky noted, inter alia, that the company "is not especially qualified to trade gold and platinum contracts by virtue of experience or expertise, although they have done so to a limited extent."

In late 1980, InterAct entered into an agreement with LMEI whereby it would refer investors to LMEI, and the two corporations would split evenly all commissions from any resulting trades. InterAct promoted LMEI to interested investors through a network of financial advisers it employed and with whom Ketron was personally acquainted. In the cases of at least several petitioners, their InterAct advisers were also their regular financial advisers and/or accountants, who also prepared their Federal tax returns.

The financial advisers who referred investors to InterAct, as well as some investors, were provided with an information package which included a document styled "Advisor Information Sheet - Commodity Trading Account," pertaining to accounts opened during 1980. Under the heading "Tax Analysis," the Advisor Information Sheet stated, in part, as follows:

As part of its services to advisors, [InterAct] suggests a computer tax analysis for each of the advisor's clients who contemplate establishing a trading account. The analysis is based upon the clients [sic] estimate of future income, and calculates taxable income, tax liability and projected results of an investment in a trading account.

Appearing at the top of the Advisor Information Sheet was the following table, reproduced verbatim:

|  | Margin cash | Advisory fee | Possible tax deductions this year | |
|---|---|---|---|---|
| Accounts through November 1 | $6,250 | $2,000 | $50,000 | (minimum account) |
|  | 10,000 | 2,000 | 80,000 | |
|  | 12,500 | 2,500 | 100,000 | |
|  | 25,000 | 5,000 | 200,000 | |

| | Margin cash | Advisory fee | Possible tax deductions this year | |
|---|---|---|---|---|
| Accounts through December[6] | $7,500 | $2,000 | $50,000 | (minimum account) |
| | 12,000 | 2,000 | 80,000 | |
| | 15,000 | 2,500 | 100,000 | |
| | 30,000 | 5,000 | 200,000 | |
| Accounts through December 22 | $8,750 | $2,000 | $50,000 | (minimum account) |
| | 14,000 | 2,000 | 80,000 | |
| | 17,500 | 2,500 | 100,000 | |
| | 35,000 | 5,000 | 200,000 | |

The information package also included: (1) Sample Federal tax returns for individuals, corporations, and partnerships, recommending in the case of individuals that investors should report losses simply as "contract cancellation charges" (no entries explaining how to report profits are shown on such forms); (2) a description of procedures to follow in the event of an Internal Revenue Service audit, including an admonition that advisers and clients "should be notified in advance that any information they communicate to IRS agents could produce unfavorable ramifications;" (3) a number of documents explaining the profit and loss potential in trading certain commodity straddles; and (4) a statement of principles, including the requirement that the investor have an annual "taxable income" of at least $50,000, and at least $200,000 in assets in order to be eligible to use InterAct's services.

Also included in the information package was a document styled "Investment Criteria of Forward Contracts," which provided, inter alia, as follows:

For the Forward Contracts to produce a capital gain or loss, I.R. Code Section 1222 requires that there be a "sale or exchange" of a CAPITAL ASSET. * * *

Recognizing that the investor does not have a complete sale or exchange when the Forward is cancelled, the gain or loss resulting from the cancellation should be treated as an ordinary gain or loss.

With the exception of petitioner Mahoney, each petitioner opened an account with LMEI/LMEC by executing a trading authorization which granted it discretionary authority to

---

[6]The date appearing on this line is illegible on the exhibit entered into evidence.

manage his account, including authority, inter alia, "to give and place any and all orders or purchase and/or sell (including short sales) and otherwise trade in commodities, commodities forward contracts, and/or commodities futures contracts, on margin or otherwise." Each such petitioner executed such a trading authorization in advance of any trading activity on his account, except for petitioner Easterling, whose trading authorization was dated December 7, 1980, but for whom trading was begun on December 5, 1980. Petitioners did not instruct LMEI/LMEC in their trading authorizations or otherwise to limit losses which might be sustained on their accounts.

With the exception of petitioner Bramblett, who had no dealings with InterAct, each petitioner was introduced to LMEI/LMEC through InterAct, and certain petitioners made payments to the latter corporation, as follows:

TABLE 1

| Petitioner | Date of payment | Amount |
|---|---|---|
| Formsma | 12/15/80 | $2,000 |
| Mahoney | [7]10/24/80 | 1,250 |
| Enrici | 12/22/80 | 22,500 |
| Wooldridge (1980) | 12/10/80 | 2,000 |
| Wooldridge (1981)[8] | 11/24/81 | 6,000 |
| Easterling[9] | - - - | 4,500 |

The foregoing petitioners paid such fees to InterAct in the belief that they were for continuing informational services concerning their investments with LMEI/LMEC.

Unlike the other petitioners, Mahoney had a 21.7391-percent interest in an LMEI/LMEC account, numbered 04975, which was opened in the name of Avery Klein as nominee. Klein was a certified public accountant, one of whose clients was Robert Ketron. Klein maintained two accounts with LMEI/LMEC for trading in gold and platinum, each of which was held on behalf of a different group of investors who were also

---

[7]Mahoney's fees were paid to an individual named Avery Klein on the date indicated. The record does not disclose the date Klein transmitted the fees to InterAct.

[8]Petitioner Wooldridge opened separate accounts with LMEI/LMEC numbered 10994 and 96500, for 1980 and 1981, respectively.

[9]The date of Easterling's payment to InterAct is not disclosed on this record. Petitioners' contention that the Easterling payment was actually made relative to an unrelated pistachio nut growing venture, however, is clearly belied by his admission at trial that he paid this amount to InterAct and then deducted it on his return as an advisory fee.

clients of his accounting practice. Klein granted LMEI/LMEC full discretionary management authority with respect to his accounts. For his services, which included keeping track of paperwork for his client-investors, Klein received as his fee, 40 percent of the fee that was paid to InterAct.

When potential investors sought to open an account with LMEI/LMEC through InterAct, they were explicitly required by InterAct to first call LMEI/LMEC and then transmit to it a completed account registration form and cashier's check to cover initial margin requirements. In the words of Paul Gleeson, the margin requirements constituted LMEI/LMEC's "insurance policy against risk."

During the years in issue, petitioners' margin accounts with LMEI/LMEC reflected the following credits for payments and, in some instances, transfers of funds from such account to separate and unrelated accounts maintained by petitioners in other commodities which were allegedly traded in pounds sterling:

TABLE 2

| Account | Account No. | Initial payment | | Transfer of funds | | |
|---|---|---|---|---|---|---|
| | | Date posted | Amount | Date posted | Amount | Net margin |
| Forseth | 02778 | 12/31/80 | $7,500 | 12/31/80 | ($1,250) | $6,250 |
| Formsma | 02777 | 12/22/80 | 19,000 | 01/06/81 | (9,000) | 10,000 |
| Klein | 04975 | 11/10/80 | 28,750 | 12/24/80 | (3,250) | 25,500 |
| | | 11/11/80 | | | | |
| Bramblett | 01046 | 12/31/80 | 15,000 | - - - | - - - | 15,000 |
| Enrici | 02605 | 12/29/80 | 100,000 | 01/08/81 | (10,000) | 90,000 |
| Wooldridge (1980) | 10994 | 12/15/80 | 10,000 | 12/15/80 | (1,625) | 8,375 |
| Wooldridge (1981) | 96500 | 12/02/81 | 10,000 | - - - | - - - | 10,000 |
| Easterling | 02475 | 12/02/80 | 27,000 | 01/08/81 | (4,500) | 22,500 |

Petitioner Bramblett's payment of $15,000 was made by means of a check dated December 23, 1980, and drawn on the Republic National Bank of Dallas.

Petitioner Forseth's payment of $7,500 was made by means of a wire transfer on December 30, 1980, from a bank located in Waukesha, Wisconsin, to the Bank Nationale of Paris. At trial, Forseth did not know why the margin for LMEI/LMEC in London was wired to an entity located in Paris, but he did know that it was wired in the morning, Wisconsin time. Since the time in Paris is 7 hours ahead of the time in Waukesha,

the funds could not have been posted to the Paris account before late afternoon on December 30, 1980, and as noted in table 2, they were posted to Forseth's account with LMEI/LMEC on the following day.

Of the initial margin in the Klein account of $28,750, a 21.7391-percent share, or $6,250, was paid by petitioner Mahoney.

As of the time of trial in this matter, none of the foregoing accounts had been subject to a margin call by LMEI/LMEC, and no petitioner had posted any additional margin.[10]

Beginning in November and December of 1980, pursuant to its discretionary authority, LMEI/LMEC entered into a number of alleged transactions on behalf of Avery Klein and petitioners Forseth, Formsma, Bramblett, Enrici, Wooldridge, and Easterling. The transactions were structured in the form of intercommodity straddles, comprised of offsetting long and short forward contracts in equal quantities of gold, on the one side, and platinum, on the other. The straddles were quantity-balanced, rather than price-balanced, because the prices of gold and platinum remained close during the years in issue, and one could only purchase gold and platinum in 100 troy ounce units.

Such forward straddles are similar in form to the futures straddles described in some detail by this Court in *Smith v. Commissioner*, 78 T.C. 350, 354–357 (1982), except that forward contracts are agreements between principals which are not traded on any recognized exchange. Unlike futures traded on regulated exchanges, the alleged LMEI/LMEC forward trades were not subject to any limits on price movements which could occur during each trading day. The price of a forward contract on an unregulated market will not necessarily be the same as an otherwise comparable futures contract on a regulated exchange.

On their individual income tax returns for 1980 and 1981, petitioners claimed the following losses relative to their accounts with LMEI/LMEC:

---

[10]While petitioner Wooldridge testified that he posted additional margin of $1,000 after 1981, and LMEI/LMEC's trading records reflect a credit in that amount on Apr. 19, 1982, we believe that Gleeson's confirmation at trial that no margin calls were ever made coupled with Wooldridge's failure to produce a canceled check or other evidence to corroborate his testimony, convinces us that such amount, if paid by him at all, was for purposes other than posting additional margin.

TABLE 3

| | | Loss reported | |
|---|---|---|---|
| Petitioner | Year | Amount | Character |
| Forseth | 1980 | $50,400 | ordinary |
| Formsma | 1980 | 80,500 | ordinary |
| Mahoney | 1980 | 50,022 | ordinary |
| Bramblett | 1980 | 121,300 | ordinary |
| Enrici | 1980 | 1,732,000 | capital |
| Wooldridge | 1980 | 66,500 | ordinary |
| | 1981 | 102,700 | ordinary |
| Easterling | 1980 | 177,600 | ordinary |

The foregoing claimed losses resulted from the alleged closing of certain forward contracts by cancellation or offset in 1980 and 1981. When a position was closed by cancellation, LMEI/LMEC purported to extinguish the responsibilities of the investor thereunder, debiting his account for a "cancellation fee" equal to the amount of loss inherent in the position. In such instances, petitioners had no way of knowing, and did not know, how the amount of the loss was determined. When a position was closed by offset, on the other hand, LMEI/LMEC allegedly would enter into an opposite contract for the purchase or sale of the same quantity of the same commodity on the same delivery date. In the instant cases, all losses claimed by petitioners resulted from the closing of positions by cancellation, with the exception of petitioner Enrici, whose loss positions were all closed by offset.

The transactions reflected in petitioners' accounts, which gave rise to the foregoing claimed losses, were as follows:

TABLE 4

| | | Transaction | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Account | | Date | Description | Contract No.[11] | Delivery date | Troy ounces | Price per troy ounce | Gain/loss |
| Forseth | (1) | 12/30/80 | [12]Short P | [13]120796(3) | 08/31/82 | 2400 | $684 | |
| | (2) | 12/30/80 | Long G | 120563 | 04/30/82 | 2400 | 680 | |
| | (3) | 12/31/80 | CANCEL | 120796(1) | 08/31/82 | 2400 | 705 | [14]($50,400) |
| | (4) | 12/31/80 | Short G | 121167 | 06/30/82 | 2400 | 712 | |

[11]This number denotes either the number of the long or short contract entered into, or in the case of a cancellation or offset entry, the number of the contract canceled or offset.

[12]"P" denotes platinum and "G" denotes gold.

[13]The parenthetical number cross references the line describing the contract which was canceled or offset.

[14]This loss figure is computed as the difference between the products of the ounces and price of contract number 120796 on 12/30/80 and on 12/31/80, when it was canceled.

| Account | | Date | Description | Contract No. | Transaction Delivery date | Troy ounces | Price per troy ounce | Gain/loss |
|---|---|---|---|---|---|---|---|---|
| Formsma | (1) | 12/12/80 | Short G | 117560(7) | 02/12/82 | 600 | $632 | |
| | (2) | 12/12/80 | Long P | 117522 | 04/12/82 | 600 | 633 | |
| | (3) | 12/16/80 | Long P | 117831 | 04/16/82 | 500 | 648 | |
| | (4) | 12/16/80 | Short G | 117957(10) | 02/16/82 | 500 | 647 | |
| | (5) | 12/17/80 | Long P | 118685 | 04/16/82 | 300 | 664 | |
| | (6) | 12/17/80 | Short G | 118702(9) | 02/16/82 | 300 | 663 | |
| | (7) | 12/23/80 | CANCEL | 117560(1) | 02/12/82 | 600 | [15]701 | ($41,400) |
| | (8) | 12/23/80 | Short P | 119195 | 06/24/82 | 600 | 712 | |
| | (9) | 12/24/80 | CANCEL | 118702(6) | 02/16/82 | 300 | 706 | (12,900) |
| | (10) | 12/24/80 | CANCEL | 117957(4) | 02/16/82 | 500 | [16]699.40 | (26,200) |
| | (11) | 12/24/80 | Short P | 119840 | 06/24/82 | 300 | 712 | |
| | (12) | 12/24/80 | Short P | 119839 | 06/24/82 | 500 | 711 | |
| | | | | | | | | (80,500) |
| Klein[17] | (1) | 11/10/80 | Long G | 114502 | 06/30/82 | 1500 | 725 | |
| | (2) | 11/10/80 | Short P | 114479(9) | 02/10/82 | 1500 | 708 | |
| | (3) | 11/12/80 | Long G | 114587 | 07/09/82 | 1200 | 741 | |
| | (4) | 11/12/80 | Short P | 114517(13) | 02/12/82 | 1200 | 712 | |
| | (5) | 11/13/80 | Long G | 115095 | 06/29/82 | 1800 | 727 | |
| | (6) | 11/13/80 | Short P | 114924(14) | 02/12/82 | 1800 | 708 | |
| | (7) | 11/14/80 | Long G | 115161 | 06/29/82 | 1200 | 723 | |
| | (8) | 11/14/80 | Short P | 114981(11) | 02/12/82 | 1200 | 710 | |
| | (9) | 11/18/80 | CANCEL | 114479(2) | 02/10/82 | 1500 | 759 | (76,500) |
| | (10) | 11/18/80 | Short G | 114889 | 04/07/82 | 1500 | 724 | |
| | (11) | 11/19/80 | CANCEL | 114981(8) | 02/12/82 | 1200 | 742 | (38,400) |
| | (12) | 11/19/80 | Short G | 115049 | 03/24/82 | 1200 | 733 | |
| | (13) | 11/20/80 | CANCEL | 114517(4) | 02/12/82 | 1200 | 745 | (39,600) |
| | (14) | 11/20/80 | CANCEL | 114924(6) | 02/12/82 | 1800 | 750 | (75,600) |
| | (15) | 11/20/80 | Short G | 115041 | 02/26/82 | 1800 | 740 | |
| | (16) | 11/20/80 | Short G | 115040 | 02/26/82 | 1200 | 741 | [18] |
| | | | | | | | | (230,100) |

[15]Exhibits entered into the record reflect a difference of $1 between the parties with respect to this figure. In the absence of evidence to corroborate either figure in the stipulated trading records, we have adopted respondent's figure, since it is consistent with the total amount of losses claimed by petitioner Formsma.

[16]Exhibits entered into the record reflect a difference of $2.60 between the parties with respect to this figure. For the same reasons described in note 15, we have adopted respondent's figure.

[17]Reflected herein are the transactions relative to Avery Klein's nominee account number 04975, with respect to which petitioner Mahoney owned a 21.7391-percent interest.

[18]Mahoney claimed only losses attributable to his 21.7391 percent share of this account, or $50,022.

138

|  |  | | Transaction | | | | |
|---|---|---|---|---|---|---|---|
| Account | Date | Description | Contract No. | Delivery date | Troy ounces | Price per troy ounce | Gain/loss |
| Bramblett (1) | 12/22/80 | Short G | 119010 | 04/22/82 | 1000 | $714 | |
| (2) | 12/22/80 | Long P | 118994(9) | 06/22/82 | 1000 | 709 | |
| (3) | 12/23/80 | Short G | 119223 | 04/30/82 | 1500 | 718 | |
| (4) | 12/23/80 | Long P | 119207(7) | 06/24/82 | 1500 | 713 | |
| (5) | 12/24/80 | Long P | 119788(10) | 06/25/82 | 800 | 714 | |
| (6) | 12/24/80 | Short G | 119812 | 04/30/82 | 800 | 719 | |
| (7) | 12/30/80 | CANCEL | 119207(4) | 06/24/82 | 1500 | 672 | ($61,500) |
| (8) | 12/30/80 | Long G | 120637 | 02/23/82 | 1500 | 667 | |
| (9) | 12/31/80 | CANCEL | 118994(2) | 06/22/82 | 1000 | 678 | (31,000) |
| (10) | 12/31/80 | CANCEL | 119788(5) | 06/25/82 | 800 | 678 | (28,800) |
| (11) | 12/31/80 | Long G | 121070 | 02/23/82 | 1000 | 676 | |
| (12) | 12/31/80 | Long G | 121071 | 02/26/82 | 800 | 674 | |
| | | | | | | | (121,300) |
| Enrici (1) | 12/18/80 | Short P | 118328(21) | 04/19/82 | 5000 | 668 | |
| (2) | 12/18/80 | Short P | 118329(27) | 04/26/82 | 6000 | 669 | |
| (3) | 12/18/80 | Long G | 118385 | 02/09/82 | 6000 | 666 | |
| (4) | 12/18/80 | Long G | 118386 | 02/12/82 | 6000 | 664 | |
| (5) | 12/18/80 | Long P | 118628 | 02/18/82 | 5000 | 655 | |
| (6) | 12/18/80 | Long P | 118629 | 02/18/82 | 6000 | 656 | |
| (7) | 12/18/80 | Short G | 118646(17) | 04/22/82 | 6000 | 679 | |
| (8) | 12/18/80 | Short G | 118647(15) | 04/23/82 | 6000 | 677 | |
| (9) | 12/19/80 | Short G | 118682(19) | 04/09/82 | 5000 | 709 | |
| (10) | 12/19/80 | Short G | 118683(23) | 04/26/82 | 6000 | 679 | |
| (11) | 12/19/80 | Long G | 118390(31) | 02/16/82 | 5000 | 696 | |
| (12) | 12/19/80 | Long G | 118391 | 02/22/82 | 6000 | 666 | |
| (13) | 12/19/80 | Long P | 118664(35) | 02/22/82 | 4000 | 664 | |
| (14) | 12/19/80 | Short P | 118336(29) | 04/20/82 | 4000 | 676 | |
| (15) | 12/23/80 | OFFSET | 118647(8) | 04/23/82 | 6000 | 720 | (258,000) |
| (16) | 12/23/80 | Short G | 119264 | 06/23/82 | 6000 | 733 | |
| (17) | 12/23/80 | OFFSET | 118646(7) | 04/22/82 | 6000 | 721 | (252,000) |
| (18) | 12/23/80 | Short G | 119263 | 06/22/82 | 6000 | 734 | |
| (19) | 12/23/80 | OFFSET | 118682(9) | 04/09/82 | 5000 | 723 | (70,000) |
| (20) | 12/23/80 | Short G | 119265 | 06/23/82 | 5000 | 732 | |
| (21) | 12/23/80 | OFFSET | 118328(1) | 04/19/82 | 5000 | 700 | (160,000) |
| (22) | 12/23/80 | Short P | 119192 | 06/22/82 | 4000 | 714 | |
| (23) | 12/24/80 | OFFSET | 118683(10) | 04/26/82 | 6000 | 721 | (252,000) |
| (24) | 12/24/80 | Short G | 119881 | 06/29/82 | 6000 | 734 | |
| (25) | 12/24/80 | Long P | 119863(33) | 02/24/82 | 5000 | 688 | |
| (26) | 12/24/80 | Short P | 119836 | 06/16/82 | 5000 | 714 | |
| (27) | 12/24/80 | OFFSET | 118329(2) | 04/26/82 | 6000 | 700 | (186,000) |
| (28) | 12/24/80 | Short P | 119835 | 06/24/82 | 6000 | 715 | |
| (29) | 12/24/80 | OFFSET | 118336(14) | 04/20/82 | 4000 | 700 | (96,000) |
| (30) | 12/24/80 | Short P | 119834 | 04/23/82 | 5000 | 701 | |
| (31) | 12/30/80 | OFFSET | 118390(11) | 02/16/82 | 5000 | 666 | (150,000) |
| (32) | 12/30/80 | Long G | 120619 | 06/07/82 | 5000 | 696 | |

| Account | | Date | Description | Contract No. | Delivery date | Troy ounces | Price per troy ounce | Gain/loss |
|---|---|---|---|---|---|---|---|---|
| | | | *Transaction* | | | | | |
| Enrici | (33) | 12/30/80 | OFFSET | 119863(25) | 02/24/82 | 5000 | $644 | ($220,000) |
| | (34) | 12/30/80 | Long P | 120603 | 06/25/82 | 5000 | 673 | |
| | (35) | 12/30/80 | OFFSET | 118664(13) | 02/22/82 | 4000 | 642 | (88,000) |
| | (36) | 12/30/80 | Long P | 120604 | 06/25/82 | 4000 | 674 | |
| | | | | | | | | (1,732,000) |
| Wooldridge | (1) | 12/09/80 | Long P | 116777(5) | 06/09/82 | 500 | 737 | |
| (1980) | (2) | 12/09/80 | Short G | 116794 | 04/09/82 | 500 | 718 | |
| | (3) | 12/10/80 | Long P | 117014(7) | 06/15/82 | 400 | 713 | |
| | (4) | 12/10/80 | Short G | 117061 | 04/23/82 | 400 | 708 | |
| | (5) | 12/12/80 | CANCEL | 116777(1) | 06/09/82 | 500 | 648 | (44,500) |
| | (6) | 12/12/80 | Long G | 117565 | 02/12/82 | 500 | 633 | |
| | (7) | 12/16/80 | CANCEL | 117014(3) | 06/15/82 | 400 | [19]658 | (22,000) |
| | (8) | 12/16/80 | Long G | 118911 | 02/16/82 | 400 | 642 | |
| | | | | | | | | (66,500) |
| Wooldridge | (1) | 06/16/81 | Long P | 106191(7) | 06/15/83 | 500 | 581.20 | |
| (1981) | (2) | 06/16/81 | Short G | 106189 | 04/06/83 | 500 | 594.10 | |
| | (3) | 06/17/81 | Long P | 106213(9) | 06/22/83 | 400 | 578.80 | |
| | (4) | 06/17/81 | Short G | 106215 | 04/06/83 | 400 | 591.70 | |
| | (5) | 06/19/81 | Long P | 106221(11) | 06/22/83 | 500 | 575 | |
| | (6) | 06/19/81 | Short G | 106225 | 04/13/83 | 500 | 588 | |
| | (7) | 07/02/81 | CANCEL | 106191(1) | 06/15/83 | 500 | ([20]) | (33,100) |
| | (8) | 07/02/81 | Long G | 106265 | 02/02/83 | 500 | 525.60 | |
| | (9) | 07/06/81 | CANCEL | 106213(3) | 06/22/83 | 400 | - - - | (34,000) |
| | (10) | 07/06/81 | Long G | 106273 | 02/16/83 | 400 | 504 | |
| | (11) | 07/07/81 | CANCEL | 106221(5) | 06/22/83 | 500 | - - - | (35,600) |
| | (12) | 07/07/81 | Long G | 106284 | 02/09/83 | 500 | 513.60 | |
| | | | | | | | | (102,700) |
| Easterling | (1) | 12/05/80 | Short G | 116536 | 04/08/82 | 1000 | 738 | |
| | (2) | 12/05/80 | Long P | 116596(7) | 06/09/82 | 1000 | 754 | |
| | (3) | 12/08/80 | Short G | 116715 | 04/09/82 | 800 | 733 | |
| | (4) | 12/08/80 | Long P | 116667(9) | 06/09/82 | 800 | 741 | |
| | (5) | 12/10/80 | Short G | 117047 | 04/09/82 | 200 | 705 | |
| | (6) | 12/10/80 | Long P | 116992(10) | 06/15/82 | 200 | 714 | |

---

[19]Exhibits entered into the record reflect a difference of $1 between the parties with respect to this figure. For the same reasons described in note 15, we have adopted respondent's figure.

[20]The record does not disclose the prices at which the contracts in Wooldridge's 1981 account were canceled.

| Account | Date | Transaction Description | Contract No. | Delivery date | Troy ounces | Price per troy ounce | Gain/loss |
|---------|------|-------------|--------------|---------------|-------------|---------------------|-----------|
| Easterling | (7) 12/12/80 | CANCEL | 116596(2) | 06/09/82 | 1000 | $653 | ($101,000) |
| | (8) 12/12/80 | Long G | 117434 | 02/08/82 | 1000 | 634 | |
| | (9) 12/16/80 | CANCEL | 116667(4) | 06/09/82 | 800 | 659 | (65,000) |
| | (10) 12/16/80 | CANCEL | 116992(6) | 06/15/82 | 200 | 659 | (11,000) |
| | (11) 12/16/80 | Long G | 117862 | 02/16/82 | 200 | 641 | |
| | (12) 12/16/80 | Long G | 117861 | 02/09/82 | 800 | 639 | |
| | | | | | | | (177,600) |

In 1980 and 1981, neither gold nor platinum was traded on the London Metal Exchange or on any other commodity exchange in London. While two daily "fixes" were published, reflecting the price of spot gold for immediate delivery, there were no published prices in London for spot platinum or for forward contracts in gold or platinum. In the instant cases, petitioners had no way of verifying the prices at which LMEI/LMEC allegedly conducted transactions on their behalf.

On their Federal income tax returns for the years in issue, each petitioner, except Enrici, reported gross income and adjusted gross income in the following amounts:

TABLE 5[21]

| Petitioner | Year | Item | Gross income Amount | Total | Adjusted gross income |
|-----------|------|------|--------|-------|----------------------|
| Forseth | 1980 | Wages | $13,000 | | |
| | | Interest | 676 | | |
| | | Supplemental | 39,673 | | |
| | | | | $53,349 | $3,112 |
| Formsma | 1980 | Wages | 122,594 | | |
| | | Interest | 1,697 | | |
| | | Tax refund | 11 | | |
| | | Fees | 31,925 | | |
| | | | | 157,227 | 66,203 |
| Mahoney | 1980 | Wages | 21,280 | | |
| | | Interest | 671 | | |
| | | Dividends | 134 | | |
| | | Supplemental | 76,298 | | |
| | | | | 98,383 | 30,161 |
| Bramblett | 1980 | Wages | 120,000 | | |
| | | Fees | 72,622 | | |
| | | Capital gains | 2,231 | | |
| | | | | 194,853 | 53,124 |

[21]The amounts shown in table 5 are rounded to the nearest dollar.

| Petitioner | Year | Item | Gross income | | Adjusted gross income |
|---|---|---|---|---|---|
| | | | Amount | Total | |
| Wooldridge | 1980 | Wages | $154,518 | | |
| | | Interest | 31 | | |
| | | Dividends | 966 | | |
| | | Business | 1,234 | | |
| | | | | $156,749 | $54,215 |
| Wooldridge | 1981 | Wages | 176,495 | | |
| | | Interest/dividends | 247 | | |
| | | Capital gains | 5,659 | | |
| | | | | 182,401 | 30,947 |
| Easterling | 1980 | Wages | 23,903 | | |
| | | Interest | 4,061 | | |
| | | Business | 178,409 | | |
| | | Farm | 31,029 | | |
| | | Capital gains | 251 | | |
| | | | | 237,653 | 17,908 |

The losses claimed by the foregoing petitioners relative to their accounts with LMEI/LMEC, offset the following percentages of their adjusted gross income, exclusive of such losses:

TABLE 6

| Petitioner | Year | Percentage of adjusted gross income offset |
|---|---|---|
| Forseth | 1980 | 94% |
| Formsma | 1980 | 55 |
| Mahoney | 1980 | 62 |
| Bramblett | 1980 | 70 |
| Wooldridge | 1980 | 55 |
| Wooldridge | 1981 | 77 |
| Easterling | 1980 | 91 |

In the case of petitioners Enrici, their claimed losses from trading in gold and platinum forwards, in the amount of $1,732,000 were combined with certain short-term capital gains and losses from trades in other commodities, as well as with a short-term capital loss carryover from a prior year, for a net short-term capital loss of $1,741,931. Since they also reported net long-term capital gains in the amount of $1,991,748, the Enricis' had a net gain in 1980 of $249,817, of which 40 percent, or $99,927 was reported as taxable in that year.

The Enricis' reported adjusted gross income in 1980 in the amount of $141,949. In the absence of the LMEI/LMEC losses for 1980, they would have reported adjusted gross income in the amount of $834,749, so that the LMEI/LMEC losses offset their adjusted gross income by some 83 percent.

The data reflected in table 4 is taken principally from documentation of trades maintained by LMEI/LMEC, and entered into evidence herein as stipulated exhibits (hereinafter referred to, collectively, as trading records). The entries in the trading records, in turn, were taken, at least in part, from handwritten worksheets which were updated by LMEI/LMEC contemporaneously with the transactions which they purport to reflect. Such worksheets were entered into evidence for the account of each petitioner herein, except the worksheets for the accounts of Wooldridge (1981) and Klein.

After the years in issue, the trading records reflect that LMEI/LMEC took the following actions relative to the open positions remaining in each of the subject accounts, as reflected on table 4:[22]

(1) *Forseth*—The times for delivery on the two open gold positions were extended, first to 1984, and then to 1986, with corresponding changes in the contract prices, such that no gain was realized as of the time of the trial in this matter.

(2) *Formsma*—In or about June of 1982, the six open platinum positions were purportedly sold to a Swiss corporation known as Broadstreet Investments, resulting in a gain of $70,500.

(3) *Klein*—In February and March of 1982, the eight remaining open gold positions were closed by entering into offsetting contracts, for a total gain in the Klein account of $189,240, of which $41,139 was Mahoney's share.

(4) *Bramblett*—The times for delivery on the six open gold positions were extended to February and March of 1984, with corresponding changes in the contract prices, and were then closed by entering into offsetting contracts on February 21, 1984, for a gain of $106,230.

---

[22]Petitioners request that we find that certain payments were made by them to an entity known as Broadstreet Investments in return for its agreement to purchase their contracts, and to LMEI/ LMEC, in return for its extension of their contracts into future years. Since we find no credible evidence to substantiate the LMEI/LMEC journal entries reflecting such alleged payments, however, we decline to make the requested findings.

(5) *Enrici*—The times for delivery on 14 of the open positions were extended, first to 1984, and then to 1986, with corresponding changes in the contract prices, such that no gain was realized as of the time of the trial in this matter; and the remaining two open platinum positions, contracts 119836 and 120603, were purportedly sold to Broadstreet Investments, resulting in a gain of $209,000.

(6) *Wooldridge*—(a) *1980*—On February 3, 1984, the four remaining open gold positions which had been extended to February and March of 1984, were closed by entering into offsetting contracts, for a gain of $58,320.

(b) *1981*—The times for delivery on the six open gold positions were extended to March and May of 1985, with corresponding changes in the contract prices, such that no gain was realized as of the time of the trial in this matter.

(7) *Easterling*—On February 1, 1982, the six remaining open gold positions were closed by entering into offsetting contracts, for a gain of $155,100.

As a result of the aforedescribed transactions, Avery Klein and those petitioners whose gold and platinum positions were fully liquidated as of the time of the trial in this matter purportedly sustained the following net losses:[23]

TABLE 7

| Account | 1980 losses | Post-1980 gains | Net losses |
|---|---|---|---|
| Formsma | $80,500 | $70,500 | $10,000 |
| Klein | 230,100 | 189,240 | 40,860 |
| Bramblett | 121,300 | 106,230 | 15,070 |
| Wooldridge (1980) | 66,500 | 58,320 | 8,180 |
| Easterling | 177,600 | 155,100 | 22,500 |

For Klein and the foregoing four petitioners, a comparison of their net losses from table 7, with the balances in their margin accounts net of transfers to unrelated accounts, from table 2, as follows:

TABLE 8

| Account | Margin balance | Net losses | Difference |
|---|---|---|---|
| Formsma | $10,000 | $10,000 | 0 |
| Klein | 25,500 | 40,860 | ($15,360) |

[23]As we have found, a number of positions which were held by petitioners Forseth, Enrici, and Wooldridge (in the 1981 account) were rolled forward into 1985 and 1986.

| Account | Margin balance | Net losses | Difference |
|---|---|---|---|
| Bramblett | $15,000 | $15,070 | ($70) |
| Wooldridge (1980) | 8,375 | 8,180 | 195 |
| Easterling | 22,500 | 22,500 | 0 |

As of the time of the trial in this matter, LMEI/LMEC had not collected the foregoing $70 deficit balance from petitioner Bramblett.

In the case of petitioner Wooldridge's 1981 account, certain manually typed "debit notes," which are included in the trading records, reflect charges in July of 1981 of $33,100, $34,000, and $35,600, as reflected in table 4, for the cancellation of contracts which are described as having been entered into in June of 1981. However, two computer-generated documents contained in the trading records, styled "Statement of Account on Closed Positions," dated December 31, 1981, and April 29, 1983, both reflect the same charges for cancellation of the same contracts, not in July of 1981, but in October of that year.

In the case of Avery Klein's nominee account, in which petitioners Mahoney held a 21.7391-percent interest, the trading records reflect a credit entry on March 3, 1983, in the amount of $15,290. This entry is described solely as "Journal From Related A/C," and remains otherwise unexplained in the LMEI/LMEC documentation. The $15,290 credit entry is netted against the $15,360 debit entry in the trading records, resulting in a so-called "due balance" of $70.

At those times when American markets trading in gold and platinum futures or forward contracts are open, prices on such positions would be generally comparable to prices in other markets around the world. While the price on a foreign market might deviate from the settlement or closing price on an American exchange after the latter has closed, particularly in the event of a major intervening world event, such deviation would not last long and the economic pressures of arbitrage, or buying in one market and selling in another, would soon cause the prices to once again coincide.

The American Board of Trade (hereinafter ABT), located in New York City, is an exchange on which forward contracts in gold and platinum were traded during the years in issue. Like LMEI/LMEC, ABT places no daily limitations on the prices of

such commodities. Unlike LMEI/LMEC, ABT regularly publishes in the Wall Street Journal its closing spot and 1- to 12-month forward contract prices in gold, platinum, and other commodities.[24]

For certain dates between January of 1981 and February of 1982,[25] had petitioners liquidated their then-open gold and platinum positions at ABT's published prices for gold and platinum forward contracts,[26] as interpolated,[27] their accounts would have reflected the equity balances shown on page 146.[28]

The five petitioners who made payments to InterAct in 1980 (table 1), claimed deductions for such payments as advisory fees on their 1980 tax returns.

Respondent issued deficiency notices, in which amounts claimed by petitioners as ordinary and capital losses due to the foregoing transactions with LMEI/LMEC, were disallowed in full in all cases except for petitioner Forseth.

---

[24]This record fails to disclose the hours of the trading day on the ABT.

[25]Such dates are based upon the dates for which ABT's published forward prices are entered into the record.

[26]Table 9 is based upon the *assumed* liquidation of petitioners' LMEI/LMEC positions at the ABT prices, as interpolated to the same delivery date. The record is inconclusive as to whether or not any bona fide forward obligations in gold and platinum entered into by LMEI/LMEC could have been liquidated on the American exchange.

[27]The interpolation of prices from ABT's published prices for 6- and 12-month forward delivery was required because the delivery dates for ABT forward contracts, as entered into the record herein, do not coincide with the delivery dates for petitioners' post-1980 open positions with LMEI/LMEC. The computations of the interpolated prices were prepared by respondent's agent, Fred Swinford, and admitted into the record herein. Swinford described the manner in which the interpolations were computed as follows:

"For instance, if you were to take the twelve month spot price of $695.40 and subtract the six month spot price of $640.25 from it, you will get * * * $55 and divide that by the number of days in six months, which is approximately 182.5 days. You will come up with a daily increase in the value. This means that for every day beyond a year that the contract goes out, its cost will have to rise 30 cents a day.

"* * * the farther out a contract gets, the more costs are involved, because you have to take into account interest, storage, other factors. So * * * I would merely take the twelve month spot and then add to it the number of days times the daily factor till I arrived exactly at the delivery date as shown on the LME contract."

[28]In the case of petitioners Bramblett, for example, the account equity balances for the dates chosen were computed as follows: First, the account equity balances for the period immediately following liquidation of the 1980 positions at a loss and the switches to new straddle positions was computed as the sum of: (a) Bramblett's total margin payments, or $15,000; (b) the sum of the loss positions liquidated in 1980, or ($121,300); and (c) the net equity remaining in those positions which were still open after 1980, computed according to the LMEI/LMEC prices, or $150,500. Second, the account equity balance for such period, thus derived, was added to the net debit value which would result from liquidation of all of the open positions at the ABT prices, as interpolated, at each of the various dates shown, thus yielding the net account equity balances shown in table 9.

TABLE 9

*Account equity balances*

| Account | 1/29/81 | 2/26/81 | 3/30/81 | 4/30/81 | 6/1/81 | 7/15/81 | 9/1/81 | 10/1/81 | 11/30/81 | 12/30/81 | 2/1/82 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Forseth | ($86) | $1,042 | $1,618 | $1,138 | $16,666 | $8,098 | $17,746 | $17,194 | $13,306 | $10,618 | $11,722 |
| Formsma | 546 | 978 | (3,902) | 3,544 | 8,828 | 5,078 | 4,248 | 11,220 | 12,758 | 9,198 | 13,124 |
| Klein | (31,269) | (36,105) | (38,487) | (36,492) | (106,155) | (64,956) | (79,452) | (74,646) | (87,678) | (78,786) | (89,862) |
| Bramblett | (2,182) | (755) | 1,978 | (453) | 21,927 | 9,442 | 3,558 | 1,008 | 17,009 | 15,847 | 27,608 |
| Enrici | (24,480) | (30,440) | (72,320) | (3,630) | 311,990 | 129,750 | 157,780 | 157,000 | 290,800 | 243,450 | 337,050 |
| Wooldridge (1980) | (1,389) | (970) | (765) | (939) | 4,929 | 1,652 | (1,062) | 226 | 3,870 | 3,551 | 6,423 |
| Easterling | 10,832 | 10,722 | 12,163 | 11,800 | 24,370 | 17,344 | 14,120 | 12,900 | 22,354 | 21,682 | 27,772 |

In the case of petitioner Forseth, the claimed ordinary loss was not allowed as an ordinary loss, but a short-term capital loss of $1,500 was allowed. In his answer, however, respondent affirmatively pleaded various grounds for complete disallowance of the claimed loss, and then in the alternative, pleaded that the loss was not an ordinary loss but a capital loss, subject to the limitations of section 1211.

The deficiency notice also disallowed advisory fee deductions claimed for 1980 in the cases of petitioners Enrici, Formsma, and Wooldridge for their payments to InterAct. In his amended answer in docket No. 3346-84, for which leave to file was granted on May 25, 1984, respondent affirmatively pleaded for an increased deficiency due to disallowance of the advisory fee deduction claimed by petitioners Easterling.[29]

Respondent determined additions to tax for negligence solely against petitioners Forseth, Formsma, Bramblett, and Easterling.

During the years in issue, Forseth was self-employed as an excavation and landscaping contractor, Forsma was the president and owner of an anodizing company, Bramblett was in the real estate development and consulting business, and Easterling was a licensed real estate agent. Prior to selling real estate, Easterling was a securities salesman for 15 years, and for part of that period he had his own firm which, among other things, "handled tax shelters." While neither Forsma nor Bramblett had prior experience in trading commodities, Bramblett had been involved in investing in the stock market for 20 to 25 years. On the other hand, Forseth had previously traded in commodities, and Easterling had some exposure to commodity trading in his securities business and was aware of the possibilities for making or losing money in such investments.

On their 1980 Federal income tax returns, petitioners Forseth, Formsma, Bramblett, and Easterling reported LMEI/LMEC losses as follows:

(a) Forseth: "Platinum contract cancelled"
(b) Formsma: "Contracty cancellation charges"
(c) Bramblett: "Loss on cancellation of forward contract"

---

[29]Respondent's motion to file a similar amendment to his answer in the case of petitioners Mahoney was only filed on Oct. 1, 1984, and was denied by the Court.

(d) Easterling: "Comm Trading - FWD Contract CA"

While petitioners Forsma appended to their return three "debit notes" bearing the LMEI/LMEC letterhead, none of the foregoing four petitioners identified LMEI or LMEC on their Forms 1040 for 1980, or on the schedules appended thereto.

On Part III of Schedule B (Interest and Dividend Income) of the 1980 Form 1040, entitled "Foreign Accounts and Foreign Trusts," the following question appears:

A. At any time during the tax year, did you have an interest in or a signature or other authority over a bank account, securities account, or other financial account in a foreign country?

In 1980, petitioners Easterling, Formsma, and Forseth filed Schedules B with their returns. On the returns of Easterling and Formsma the "no" box is checked in answer to the foregoing question. On Forseth's return, no answer is checked, and Bramblett did not file a Schedule B or otherwise disclose the foreign nature of his account in 1980.

## OPINION

The principal issue for decision is whether petitioners may deduct losses resulting from the discretionary disposition by LMEI/LMEC for their accounts of the loss legs of the alleged gold and platinum forward straddles reflected on table 4.

Petitioners contend that the transactions in question were bona fide and had economic substance. They further assert that the profit standard of section 108 of the Tax Reform Act of 1984[30] applies, but that their transactions were entered into for profit whether evaluated under this standard or under the prior profit motive standard enuciated by this Court in *Smith v. Commissioner, supra.* As to all cases except petitioners Enrici, petitioners further allege that the subject losses are ordinary losses as claimed, rather than capital losses as asserted by respondent.

Respondent, on the other hand, asserts that the losses should be disallowed because the alleged forward contracts are fictitious or preconceived shams lacking economic substance. Respondent further contends that the losses are allowable

---

[30]Division A of the Deficit Reduction Act of 1984, 98 Stat. 494.

neither under the profit test of section 108 nor under *Smith*. In the alternative, in the event that the contracts giving rise to the subject losses are found to have economic substance and to have been entered into for profit under the applicable standard, respondent insists that such losses are capital rather than ordinary in nature (a point which is conceded in the case of petitioners Enrici).

For the following reasons, we agree with respondent that the subject losses should be disallowed because the instant transactions were factual shams:

## 1. *Allowance of LMEI/LMEC*

### (a) *Correlation of tax needs and losses*

All of the losses in issue resulted from transactions entered into between petitioners and one of two corporate entities located in London. As we have found, the first such corporation, LMEI, was founded in 1972 by Paul Martin and James Gourlay. The second corporation, LMEC, was owned by Gourlay.

In 1980, Paul Gleeson, who was an employee of LMEI, met Robert Ketron, who was at that time a professional geographer with no experience in commodity trading, and invited him to observe the operations of his company in London. After his return, Ketron formed a corporation named InterAct Trading Corp. for the self-described purpose of providing informational services concerning metals trading in foreign markets.

In November of 1980, at Ketron's request, a certified public accountant named Robert Warshawsky traveled to London to evaluate LMEI. While Warshawsky's visit failed to provide him with any basis to evaluate the bona fides of LMEI's forward trading in gold and platinum, his formal report included the observation that the company was not especially qualified to trade in those metals "by virtue of experience or expertise."

InterAct subsequently agreed to refer investors to LMEI, in exchange for an even split of all commissions. Notwithstanding Warshawsky's foregoing admonition, InterAct's financial advisers referred each of the petitioners herein, with the exception of Bramblett, to LMEI for the purpose of opening accounts for trading in gold and platinum forward contracts.

As we have found, American investors, including all petitioners except Bramblett, were referred to LEMI/LMEC through a network of financial advisers employed by InterAct. Each such adviser, and an undisclosed number of investors themselves, were provided by InterAct with an information package relative to opening a trading account with LEMI/LMEC. The information provided by InterAct included extensive tax advice on both reporting losses from commodity transactions, including appropriate form exemplars, and dealing with audits by the Internal Revenue Service.

Also included in the InterAct information package was a recommendation that investors authorize InterAct to prepare a computer analysis of their estimated "future income," "taxable income," "tax liability," and "projected results of an investment in a trading account." This record does not clearly disclose whether each petitioner was apprised of and/or adopted this recommendation. However, in some instances, petitioners' InterAct advisers were also their regular financial advisers or their accountants who also prepared their tax returns for them. Avery Klein, in whose nominee account petitioner Mahoney had invested, was an accountant for the founder of InterAct, Robert Ketron. Petitioner Wooldridge testified that he started his tax planning at the beginning of each year, and that at such times he met with his InterAct adviser at least monthly. Petitioner Enrici testified that his InterAct adviser knew that he had large capital gains in 1980. Each investor was also required by InterAct to have a taxable income of at least $50,000, and assets worth at least $200,000. As stated by Ketron, "we weren't asking people who made $15,000 a year with $500 in the bank to send their hard-earned dollars to London."

Taking these facts together with InterAct's foregoing recommendation, we believe that an inference may fairly be drawn that InterAct, through its agents, was generally aware of its clients' projected income and tax liability for the years in issue.[31]

Significantly, InterAct provided its advisers, and at least some of its investors, with detailed information concerning the

---

[31]Bramblett, who did not use the services of InterAct, testified that it was "possible" that LMEI/LMEC learned of his income status in 1980 through the individual who prepared his tax return, who was also an investor in LMEI/LMEC.

quality and amount of losses which an investment in LEMI/LMEC could be expected to generate. Thus, during the years in issue, either of two basic techniques was allegdly employed by LEMI/LMEC to dispose of loss contracts, viz, cancellation or offset. In a document styled "Investment Criteria of Forward Contracts," which was included in its information package, InterAct provided advice, replete with legal citations, that the closing of a forward contract by *cancellation* would not constitute a sale or exchange, and would therefore give rise to ordinary gain or loss. In another document styled "Advisor Information Sheet," InterAct purported to show the "possible tax deductions" which could be achieved in 1980 for certain specified amounts of cash margin and advisory fees. According to this document, the cash margin requirements would increase with increasing levels of posible tax deductions, and for any given amount of such deductions, the margin requirements would increase on certain dates, as accounts were opened closer to the end of the year.

As reflected in table 5, each petitioner except Enrici reported a significant amount of ordinary income but a relatively small amount of capital gains in 1980. With the losses from LEMI/LMEC trading reported in 1980 (table 3), petitioner Forseth was able to offset almost all of his gross income, petitioner Bramblett was able to offset almost exactly his substantial wage income, and petitioner Easterling was able to offset almost exactly his substantial business income. As shown on table 6, each petitioner was able to offset a substantial portion of his adjusted gross income, in percentages ranging from 55 to 94 percent, and averaging 72 percent. The losses for each such petitioner were generated by closing forwards positions by cancellation, and in accordance with InterAct's foregoing advise, were reported as ordinary losses.

Furthermore, petitioners Enrici, who were able to utilize their LEMI/LMEC losses to reduce their adjusted gross income in 1980 by some 83 percent, were unique among petitioners herein in facing a relatively large amount of capital gains in that year. Acting in a manner which was unique among the accounts described herein, LEMI/LMEC utilized its discretionary trading authority to close the Enricis' contracts, not by cancellation, but by offset. Unlike the other petitioners, the Enricis then reported capital losses which substantially offset

their capital gains for 1980.[32]

It is interesting to note, by way of contrast, in each of the five instances in which accounts had been closed as of the time of the trial in this matter, and wherein petitioners would presumably prefer capital to ordinary *gains*, the gain sides of petitioners' straddles were closed by methods other than cancellation.

The foregoing considerations suggest remarkable correlation between the tax needs of each petitioner during the years in issue and the nature and amount of tax losses delivered by LEMI/LMEC and InterAct. It should be noted that this is not a situation where losses inherent in the loss legs of petitioners' straddles at the end of 1980 greatly exceeded the income which they could offset in that year resulting in their selective closure of certain positions so as to maximize their tax benefit in that year. Rather, with the exception of the Enrici account, LEMI/LMEC closed *all* of the loss positions in a single metal in petitioners' gold and platinum trading accounts during the years in issue, with results which were surprisingly responsive to their individual tax needs in those years.

### (b) *InterAct's prediction of tax losses*

We have found that InterAct produced and distributed an Advisor Information Sheet which projected "possible tax deductions" which could be expected at various levels of margin deposit. For unexplained reasons, the Advisor Information Sheet shows margin requirements increasing as the end of 1980 approaches. While such increasing requirements bear no apparent relationship to the exposure of LMEI/LMEC in the marketplace, they do appear to relate to the diminishing time within which the company could put on straddle positions, and then liquidate the loss legs during petitioners' 1980 tax years.

This record does not reflect whether LMEI/LMEC adhered to the margin requirements shown on InterAct's Advisor Information Sheet. It also does not clearly reflect either the dates on which petitioners first opened their accounts with LMEI/LMEC, or whether the "accounts through * * * " dates on such

---

[32]As we have found, the Enricis utilized principally their LEMI/LMEC losses to reduce their long-term capital gains of $1,991,748, to a net gain of only $249,817, of which $99,927 was reported as taxable.

Sheet refer to the dates on which accounts were opened with LMEI/LMEC, InterAct, or otherwise. We therefore cannot determine with certitude which cash margin deposits' schedule from the Advisor Information Sheet might have applied to each petitioner herein. At a minimum, however, the losses actually delivered by LMEI/LMEC to petitioners in 1980 were generally within the range of the "possible tax deductions" projected by InterAct for various levels of margin deposit, and remarkably, as demonstrated in the following table, when the figures for "accounts through November 1, 1980," are used,[33] the losses projected by InterAct were right on target:

| | Adviser information sheet | | Actual margin and losses | |
| Account | Margin required | "Possible tax deductions" | Net margin posted (table 2) | 1980 losses reported |
|---|---|---|---|---|
| Forseth | $6,250 | $50,000 | $6,250 | $50,400 |
| Formsma | 10,000 | 80,000 | 10,000 | 80,500 |
| Klein | 25,000 | 200,000 | 25,500 | 230,100 |
| Bramblett | 12,500 | 100,000 | 15,000 | 121,300 |
| | 25,000 | 200,000 | | |
| Wooldridge | 6,250 | 50,000 | 8,375 | 66,500 |
| | 10,000 | 80,000 | | |
| Easterling | 12,500 | 100,000 | 22,500 | 177,600 |
| | 25,400 | 200,000 | | |

As to Avery Klein's nominee account, of the total margin posted, petitioner Mahoney had paid $6,250 prior to October 31, 1980. Pursuant to the Advisor Information Sheet, a margin deposit in this amount could yield a tax deduction of $50,000 in 1980. For 1980, Mahoney claimed losses from his LMEI/LMEC trading in the amount of $50,022.

It therefore would appear that petitioners' losses were not only remarkably responsive to their tax needs in 1980, they were also predictably so.

---

[33]The record does reflect that the Klein margin deposit, which included Mahoney's $6,250 share, was transmitted to LMEI/LMEC on Oct. 31, 1980, and that petitioner Forseth opened his account in late Fall of 1980.

(c) *Margin requirements: LMEI/LMEC's "insurance against risk"*

According to petitioners, LMEI/LMEC was at all times protected against the possibility of default on the part of any of its American investors. Such protection was purportedly provided by the company's margining requirements, which were its purported insurance against risk. As stated by Gleeson, "if a client, even though [he] may be an honorable gentleman, does not perform in his debt situation, then we are holding some collateral to cover that eventuality."[34]

Consistent with the professed importance of margin deposits to LMEI/LMEC it was the policy of the company, as described by Gleeson, not to begin trading until sufficient margin was received *unless* the client was referred by an existing client who *guaranteed* that any losses sustained on the account of the new client would be covered. However, LMEI/LMEC actually commenced alleged trades prior to posting margin deposits for each of the accounts in issue, with the exception of the account of Avery Klein, as follows:

| Account | Initial margin posted (table 2) | Trading begun (table 4) |
|---------|---------------------------------|-------------------------|
| Forseth | 12/31/80 | 12/30/80 |
| Formsma | 12/22/80 | 12/12/80 |
| Bramblett | 12/31/80 | 12/22/80 |
| Enrici | 12/29/80 | 12/18/80 |
| Wooldridge (1980) | 12/15/80 | 12/09/80 |
| Wooldridge (1981) | 12/02/81 | 06/16/81 |
| Easterling | 12/29/80 | 12/05/80 |

As to petitioner Forseth, we have found that he transmitted his margin deposit for 1980 by wire from his bank account in Wisconsin to a bank in Paris on December 30, 1980. The record does not reflect why the margin deposit for a London corporation allegedly trading in a London market was transmitted to

---

[34]While Gleeson, at one point describing the LMEI/LMEC margining system as "totally arbitrary," emphasized that this was the customary "system of margining in England," we find such uncorroborated testimony to be inconsistent both with the testimony of petitioners' own witness, Robert Warshawsky, who had inspected and reported on the LMEI/LMEC operations at the behest of Robert Ketron, to the effect that "there was some competitive pressure to keep the margins at the one-eighth to one-fourth percent level which was customary," and with Gleeson's own testimony concerning the importance of sufficient margin to the protection of his company from risk.

Paris, but given the 7-hour time difference between Wisconsin and Paris, it could not have been credited to the Paris account much before the close of the banking day on December 30, 1980, and it was not posted with LMEI/LMEC until the following day. Even with this limited time, LMEI/LMEC was still apparently able to conduct its competitive search for a market-making broker, to establish a gold/platinum straddle, and to "lay it off" to Forseth, in the manner described *infra*, all on *December 30, 1980* (table 4), prior to the posting of his margin deposit. With comparable alacrity, the corporation canceled Forseth's short position in platinum on the following day (table 4), at a loss which offset almost all of his gross income for that tax year.

On December 5, 1980, petitioner Easterling received a letter from LMEI/LMEC, stating as follows:

We are pleased to hear from our telephone conversation that you have forwarded to us a cheque in the amount of $27,000.00. We look forward to trading with you and hope that we will have a long and prosperous association.

Despite the foregoing language, Easterling's trading authorization was only executed on December 7, 1980, and his margin check was only drawn on December 17, 1980, and posted with LMEI/LMEC on December 29, 1980. Nevertheless, LMEI/LMEC began trading for Easterling on the date of his foregoing letter, and actually canceled his loss positions for 1980, on December 12 and 16 of that year (table 4). While LMEI/LMEC therefore did not have to "look forward to trading" with Easterling for very long (i.e., on the same day), his 1980 trading losses offset 91 percent of his adjusted gross income, making his 1980 association with that company very "prosperous" indeed.

Similarly, in the case of petitioner Bramblett, his long platinum position entered into on December 23, 1980, was canceled on December 30, 1980, one day prior to the posting of his margin deposit with LMEI/LMEC (table 4).

Contrary to Gleeson's testimony, therefore, it is clear that contracts were entered into and positions were even canceled at a loss anywhere from 1 day to over 5 months before certain petitioners had posted any margin with LMEI/LMEC, and in one case, 2 days before petitioner had executed his trading authorization. In light of Gleeson's testimony that commodity trading

was "a highly risky business [in which] unfortunately statistics show that 90 percent of all commodity speculators lose money," and that the ratio of gold to platinum forward contracts prices during the years in issue was "fairly volatile," we find it highly unlikely that a company undertaking bona fide trades in gold and platinum forward contracts for the accounts of its investors would accept this type of exposure.

It is true that Robert Ketron testified that either the InterAct adviser or InterAct, itself, would be liable for any margins which were not paid to LMEI/LMEC by its clients. Furthermore, Gleeson, testifying that he had confidence in InterAct and that InterAct would back up its client's commitments that margin deposits were in the mail, indicated that LMEI/LMEC also withheld a pool of funds from amounts which were credited to InterAct relative to its 50/50 commission-sharing arrangement with LMEI/LMEC, and that such funds represented a "contingency against * * * this event of a check not turning up or * * * a loss incurred."

We are not persuaded, however, that LMEI/LMEC was protected against the risks of investor noncompliance by virtue of its relationship with InterAct. First, it is undisputed that petitioner Bramblett invested in LMEI/LMEC without utilizing the services of InterAct or its advisers, and there is no evidence that he was referred by an existing client who guaranteed any losses sustained on his account. Despite the apparent absence of any insurance against risk, LMEI/LMEC began trading for Bramblett's account 1 day prior to the date of his margin deposit check and some 9 days prior to the posting of such deposit in London. Second, there is not a shred of documentary evidence in this record to substantiate the foregoing self-serving testimony of Ketron and Gleeson that InterAct had guaranteed the payments of its client-investors. Third, there is no persuasive evidence that LMEI/LMEC had any reason to believe that InterAct or its financial advisers had the financial capacity to perform under its purported guarantee or that the alleged pool of withheld commissions would be sufficient in the event of the failure of one or more of its client investors, assurances which would surely have been essential to any broker not wishing to be at risk in a real marketplace.

Consistent with his testimony that investor margin constituted LMEI/LMEC's insurance against risk, Gleeson also testi-

fied that the corporation's computers produced a daily "open position report" to assure that investors always had adequate margin in their accounts. Such reports, Gleeson testified, summarized trades, identified all open positions, and estimated the value of such positions. If margin was found to be depleted as a result of unrealized losses in an account, according to Gleeson, "We would close the position out, or we would inform the client that his money was depleted and did he wish to put up some more money."

As we have found, however, none of the subject accounts was ever subject to a margin call and no petitioner-investor ever posted any additional margin. According to respondent's agent, Fred Swinford, who was a "job coach" for commodity tax shelter specialist training and national coordinator of the so-called "LME tax shelter project," in 160 cases he had reviewed in such capacity, all of which involved investors in LMEI/LMEC, there had never been a margin call. It was Gleeson's testimony that no margin calls were made in the instant cases simply because, in his discretion, "the people did not exceed their margins."

During the years in issue, as we have found, neither gold nor platinum was traded on any exchange in London and no prices were published in London for forward contracts in those metals. Furthermore, petitioners had no way of verifying the prices at which LMEI/LMEC conducted transactions on their behalf. However, we have found that forward contracts in gold and platinum were traded on the ABT in New York, which regularly published its spot and 1- to 12-month forwards prices in the Wall Street Journal.[35]

---

[35]Respondent has entered into evidence herein, and both parties have argued extensively on brief, the results of his comparisons of the instant transactions with *futures trading* in the same metals on certain recognized American exchanges, for which prices are published in the Wall Street Journal (and were stipulated into evidence herein). However, respondent's agent, Fred Swinford, acknowledged at trial that in view of certain differences between regulated and unregulated markets, the price of a forward contract on an unregulated market may not be the same as the price of an otherwise comparable futures contract on a regulated exchange. Petitioners thus urge that respondent is comparing "apples and oranges." We agree, and since we are convinced that such a comparison of apples and oranges, and a fortiori, English apples and American oranges, would not be a probative exercise, we have decided the instant cases without regard to such evidence. However, respondent also entered into evidence, herein, certain comparisons of the instant transactions with *forward trading* in the same metals on the ABT exchange. We are mindful that such evidence constitutes a comparison, in essence, of English apples and American apples. However, we are prepared to accept the limited probativity of this comparison (with modifications which are embodied in our table 9 to correct certain computational errors), first, because of the price-leveling effects of arbitrage, which are discussed in our findings;

As indicated on table 9, assuming that petitioners had liquidated their gold and platinum positions at ABT's published gold and platinum forwards prices for certain dates between January 29, 1981, and February 1, 1982, as interpolated to comparable delivery dates, the 1980 account of each petitioner, except Easterling, would have at various times reflected negative equity balances. While we do not assume that the figures in table 9 would necessarily reflect the exact equity in similar forward contracts traded in a bona fide London market, we do believe that such figures suggest the improbability of the notion contended for by petitioners, that their accounts *at no time* reflected negative equity balances which would give rise to the need for margin calls.

### (d) *Zeroing-out of account balances*

We have found that the margin balances in the 1980 accounts of the four petitioners whose accounts were closed as of the time of the trial in this matter, as shown on table 2, were roughly equal to the excess of their 1980 losses over their 1982–84 gains, as shown in tables 7 and 8.

On December 31, 1980, petitioner Bramblett posted his initial margin deposit of $15,000 (table 2). On that day and the preceding day, Bramblett's loss positions were canceled for total losses in the amount of $121,300 (table 4). Over 3 years later, Bramblett's six open gold positions, which had been rolled forward to March of 1984, were closed by offset, for a gain of $106,280. With the closing of his accounts, Bramblett had realized a net loss only $70 in excess of the amount of his initial margin deposit (table 8). As of the time of the trial in this matter, LMEI/LMEC had not collected this sum from Bramblett.

On December 15, 1980, petitioner Wooldridge posted his initial margin deposit of $10,000 for his 1980 account, and *on the same day*, $1,625 of that deposit was transferred by LMEI/LMEC to an unrelated trading account, leaving a net margin of $8,375. On December 12 and 16 of 1980, Wooldridge's loss positions were canceled for total losses in the amount of $66,500 (table 4). Over 3 years later, Wooldridge's four open

---

second, because of the absence of any other meaningful basis upon which to evaluate the bona fides of the unpublished LMEI/LMEC pricing structure; and third, because of petitioners' failure to prove any error in accepting such a comparison.

gold positions, which had been rolled forward to February and March of 1984, were closed by offset, for a gain of $58,320. With the closing of his 1980 account, Wooldridge had realized a net loss only $195 less than the amount of his initial margin deposit, as adjusted on the same day it was posted (table 8).

On December 22, 1980, petitioner Formsma posted his initial margin deposit of $19,000 (table 2). On December 23 and 24 of 1980, Formsma's loss positions were canceled for total losses in the amount of $80,500 (table 4). Some 2 weeks later, $9,000 of Formsma's margin deposit was transferred by LMEI/LMEC to an unrelated trading account, leaving a net margin of $10,000. Some 18 months later, Formsma's six open platinum positions were sold to an alleged entity known as Broadstreet Investments, for a gain of $70,500. With the closing of his account, Formsma had realized a net loss exactly equal to the amount of his initial margin deposit, as adjusted only 2 weeks after it was posted (table 8).

On December 29, 1980, petitioner Easterling posted his initial margin deposit of $27,000 (table 2). As discussed *supra*, Easterling's loss positions had already been placed and then canceled by LMEI/LMEC some 2 weeks earlier on December 12 and 16 of 1980, for total losses in the amount of $177,600. Approximately 1 week after the posting of his initial margin, $4,500 of Easterling's deposit was transferred by LMEI/LMEC to an unrelated trading account, leaving a net margin of $22,500. Some 13 months later, Easterling's six open gold positions were sold to the same Broadstreet Investments, for a gain of $155,100. With the closing of his account, Easterling had realized a net loss exactly equal to the amount of his initial margin deposit as adjusted only 1 week after it was posted (table 8).

Given the purported volatility of the gold and platinum markets during the years in issue, the petitioners' acknowledgement on brief that after the gold/platinum straddles held by most petitioners had been converted to a straddle in one metal, they "continue[d] to have a potential to make or lose money," we do not believe that any broker in a real commodities market could so nearly predict in 1980 and early 1981, the amount of the excess of an investor's 1980 losses over his eventual gains on straddle positions closed some 2 to 4 years later. We find this apparent prescience especially remarkable

in the cases of petitioners Bramblett and Wooldridge, whose margin accounts were never adjusted after the day on which their initial margin deposits were posted. We also find it curious that the record is devoid of any credible third-party evidence to corroborate the existence or alleged role of Broadstreet Investments, yet in the only two instances where accounts were closed by purported sales of open positions to that entity, the accounts of petitioners Formsma and Easterling were zeroed-out with mathematical precision.[36]

Only in the case of the fifth closed account, the Avery Klein nominee account, was there a significant balance after all positions were closed out in or about February of 1982, in the deficit amount of $15,360. For this account, the LMEI/LMEC trading records disclose that a credit entry was made on March 3, 1983, in the amount of $15,290, leaving a deficit balance of only $70. The credit entry is described as "Journal From Related A/C," and is otherwise unexplained in any of the trading documentation. The Klein account is one of two accounts for which Gleeson said that he left the LMEI/LMEC backup workpapers behind in London. At trial, Klein explained the entry as follows:

I don't know. LME made that entry. I am assuming they just transferred it between my two accounts, not knowing that they were separate people who were involved in them. I had a great deal of problem trying to get the bookkeeping straightened on these two accounts with them. When I finally ended up with a reconciliation from them late last year, they had again combined all the accounts on the reconciliation—or both these accounts.

Klein thus attributed the $15,290 credit entry to a bookkeeping error on the part of LMEI/LMEC. However, each of Klein's accounts was held on behalf of a wholly different group of investors. Any such "bookkeeping" error would thus have the effect of increasing the equity in the loss account of one group of investors at the expense of reducing the equity in the profit account of a separate group of investors. Klein testified that he called LMEI/LMEC in an attempt to reconcile the accounts, but there is no evidence that he or any of the investors wrote to

---

[36]We note that respondent's agent, Fred Swinford, testified that he received and reviewed worksheets from other revenue agents relative to more than 160 other cases involving LMEI/LMEC commodity straddles, from which he could and did determine the losses claimed in 1980 and 1981. In all such accounts which were closed as of the time of his review (the number of which is not disclosed), the account balance was either zeroed-out, or very nearly so.

LMEI/LMEC, sought any legal advice, or threatened legal action against the London company.

We find it highly unlikely that either the investors in Klein's profit account or their nominee, who was a certified public accountant, would be so tolerant of such a grave accounting failure for a period beginning in early 1982 and continuing at least into late 1983. Moreover, Klein testified that he received from LMEI/LMEC and distributed to the investors in *both* of his nominee accounts the total margin balance of $469, which allegedly remained in the accounts after they were closed. How the deficit balance in the loss account could properly become a credit balance justifying such a distribution remains a mystery on this record.

### (e) *"Laying-off" trades*

Gleeson testified that he would enter into the transactions in issue in the following manner: First, he contacted by telephone four or five brokers who were "making markets" in forward positions in gold and platinum, which LMEI/LMEC did not do, and asked for prices on gold-platinum spreads for specified delivery dates. Each broker would quote a bid and an asked price, which were typically about $0.50 apart, per troy ounce. According to Gleeson, the prices quoted "had to be right on the market," since he could trade the full spread or, if they were not, separately trade either position therein with another market-making broker. The market-making brokers charged their clients a commission for their services. After LMEI/LMEC had purportedly established a gold-platinum straddle with the market-making broker, its policy was to avoid being at any risk in the market by immediately "laying-off" its positions; that is, using its discretionary trading authority to take opposite positions with the investor for whom the straddle was executed. For example, if LMEI/LMEC was short in gold and long in platinum with the market-makers, it would go long in gold and short in platinum with the investor, whose positions, in turn, would be short in gold and long in platinum.

In addition to the protection against investor default purportedly provided by the LMEI/LMEC margining system, therefore, since that company's purported trades in gold and platinum forwards positions were on a principal-to-principal basis in an informal telephone market, its stated policy was to

avoid being at risk by immediately "laying-off" its positions with its investors, including petitioners herein. At trial, Gleeson described the foregoing process as follows:

Q. * * * My question is directed to how [LMEI/LMEC] or any commodities firm similarly situated avoids being at risk in the market itself.

A. * * * there are two sorts of traders in London. One is a dealer, and the other is a broker. A dealer will take positions himself and gamble that he is making the right choice. A broker, as we are, will always lay off those positions, i.e., find another party to take the risk.

Q. And how does the other party take the risk?

A. Well, if, for instance, [you] had bought from me, I would buy from somebody else, and I would act as a broker in the middle and pass that deal on to the other party. But I would not be exposed.

Q. So you are saying that if [LMEI/LMEC] took a long position in gold with one person, that they would then take an offsetting short position with some other person?

A. Correct, yes.

It would appear that in order to be fully insulated from risk, LMEI/LMEC would have to lay off its positions with opposite positions *for the same delivery date.* Unexplained on this record is why the laying-off of a contract in this manner would not cause the contract to be closed out by offset. In any event, as conceded by Gleeson, under the brokerage scheme described, LMEI/LMEC stood to make money purely on its brokerage commissions, and the company had no opportunity to make money and no risk of losing money in response to price fluctuations in the gold and platinum forwards market.[37]

Essential to the position of LMEI/LMEC in the foregoing process was the establishment in the first instance of long or short forward positions with the market-making brokers, and then the immediate laying-off of such positions with their investors. While petitioners produced extensive internal documentation of their alleged "laid-off" trades, however, this record is conspicuously devoid of any evidence, documentary or otherwise, to corroborate Gleeson's testimony that opposite positions were always first entered into with the market-making brokers. Petitioners failed even to identify the supposed market-makers with whom LMEI/LMEC allegedly dealt.

---

[37]For gold and platinum straddles, according to Gleeson, the commissions were generally $0.50 per troy ounce of metal traded plus the costs of placing the trades with the market maker, and they were built into the contract prices of the trades with the investors, rather than separately stated.

This failure is especially surprising in light of Gleeson's testimony that the oral trades with market-making brokers were *always* confirmed in writing. Since the existence of competitive market-making trades would serve not only to insulate LMEI/LMEC from risk, but also to establish prices in the alleged market in which petitioners' positions were established, we find petitioners' complete failure to produce the foregoing corroborative evidence suggestive of the artificiality of such pricing and indeed of such market. See *Julien v. Commissioner*, 82 T.C. 492, 503 (1984).

### (f) *Manipulation of trading records*

Further suggestive of the artificiality of the subject market is the apparent manipulation by LMEI/LMEC of certain trading documentation relative to petitioner Wooldridge's 1981 account.[38] Included in the trading records for such account are typed debit notes reflecting charges in the amounts of the losses claimed by Wooldridge in that year for the cancellation of three contracts which are described as having been entered into, as shown on table 4, on June 16, 17, and 19 of 1981. According to petitioners, these contracts were canceled, as reflected on the debit notes and shown in table 4, in early July of 1981. However, according to two computer-generated forms styled "Statement on Account on Closed Positions" which are also included in the trading records, the instant contracts were canceled, not in July of 1981, but in October of that year.

We have found that the October cancellation dates are shown on two separate account statements, dated several years apart. Based upon the Testimony of Paul Gleeson, we have also found that these statements were generated by LEMEI/LMEC's own computers, but that the debit notes were manually typed. At trial, Gleeson contended that it was the account statements which bore erroneous dates, and attributed this to "clerical error." We find it more plausible, however, particularly since this was the second account as to which Gleeson stated that he "left behind" in London LMEI/LMEC's backup worksheets, that the dates on the manually prepared debit notes were manipulated.

---

[38]See *Ostrower v. Commissioner*, T.C. Memo. 1984–496.

For positions *established* after June 23, 1981, the apparently favorable consequences of tax straddling were eliminated by Congress in section 1092(a) added by the Economic Recovery Tax Act of 1981, Pub. L. 97–34, sec. 501(a), 95 Stat. 323, pursuant to which losses from straddles are essentially disallowed except to the extent that they exceed unrealized gains on the offsetting positions comprising the straddle. While it is therefore clear that the dates on which Wooldridge's purported 1981 contracts were established rather than on the dates on which they were canceled would determine the applicability of section 1092(a), we believe that it is probable that the cancellation dates on the debit notes were changed so as to make the pre-June 23, 1981, establishment dates less subject to question.

### (g) *Conclusion*

This Court has previously recognized that an alleged commodity straddle will not be recognized for Federal tax purposes where the underlying transaction is a sham. *Julien v. Commissioner, supra.* Section 165(a) requires that in order to be deductible a loss must be "sustained during the taxable year." The regulations under section 165(a) provide that "To be allowable as a deduction * * *, a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and * * * actually sustained during the taxable year. Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss." Sec. 1.165–1(b), Income Tax Regs. See *Gregory v. Helvering*, 293 U.S. 465 (1935). As noted recently by the Seventh Circuit in *Saviano v. Commissioner*, 765 F.2d 643 (7th Cir. 1985), affg. 80 T.C. 955 (1983):

The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, an in fact duty-bound, to look behind the contrived forms of transactions to their economic substance and to apply the tax laws accordingly.

Petitioners bear the burden of proving that the transactions actually occurred as claimed. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a).

In the instant cases, LEMEI/LMEC entered into alleged commodity straddles on behalf of each petitioner in the final 2 months, and in some instances, on the final day of their 1980 tax years.[39] Petitioners needed certain losses in 1980, and InterAct suggested that it could deliver them by placing "trades" through LEMEI/LMEC in its overseas principals market. The role of LEMEI/LMEC in this scheme was cast as that of a neutral broker, standing to make money solely on commissions, but insulated by its margining requirements and its practice of "laying-off" all trades from the vicissitudes of a purportedly risky and volatile marketplace. Viewed in light of all of the evidence, however, this role quickly evaporates, suggesting that the real role of LEMEI/LMEC was to contrive and/or manipulate an unregulated and unpublished market in gold and platinum forward contracts so that it could deliver to its investors the losses promised by its fee-splitting American liaison, InterAct.

After a careful review of the facts, we must conclude that the transactions before us were factual shams, inspired, designed, and executed by LMEI/LMEC, with the participation of InterAct, for the sole purpose of achieving for its investors capital and ordinary losses to offset their unrelated income in 1980 and 1981. Petitioners have failed to prove that there was any actual gold or platinum, that there was any real market or trading, or that there was any purpose, other than the avoidance of taxes, for any of the transactions in issue.[40] We therefore uphold respondent's disallowance of petitioners' loss deduction[41] and, in the cases of petitioners Formsma, Mahoney, Enrici, Wooldridge, and Easterling, deductions for pur-

---

[39]For reasons which we have already discussed, we do not really know when the 1981 trading documentation for Wooldridge was generated.

[40]As we have found, in the case of petitioner Forseth, the claimed ordinary loss was not allowed as an ordinary loss, but a short-term capital loss of $1,500 was allowed. Since disallowance of the capital loss was an issue first affirmatively raised by respondent in his answer, we ruled at trial that he had the burden of proof on this point. Rule 142(a). Respondent has met that burden.

[41]Petitioners make much of the reputation of Rudolf Wolff & Co., with whom the founders of LMEI, Martin and Gourlay, and Paul Gleeson were at one time associated. We therefore note that while Rudolf Wolff & Co. was in London brokerage firm dealing in commodity transactions on the well-recognized London Metal Exchange, in *Julien v. Commissioner*, 82 T.C. 492, 506–508 (1984), this Court also found that the same company, together with a corporate affiliate, was a party to a prearranged cash and carry silver transaction which represented a "grotesque distortion of the orthodox commodity straddle" (*Julien v. Commissioner, supra* at 508), and which was not entitled to recognition for Federal income tax purposes. See also *Hirai v. Commissioner*, T.C. Memo. 1984–495. Compare *Mortensen v. Commissioner*, T.C. Memo. 1984–600. In any case, Rudolf Wolff & Co. appears to have had nothing to do with the matters here in dispute.

ported advisory fees paid to InterAct.[42]

This result is not changed by section 108 of the Tax Reform Act of 1984. As this Court has found, that section only applies to straddles actually acquired by a taxpayer during the pre-1982 period, and not to alleged straddles which are, in fact, fake or fictitious. *Miller v. Commissioner*, 84 T.C. 827 (1985). See also sec. 1092(c); *Forseth v. Commissioner*, T.C. Memo. 1985-279.[43]

## 2. *Negligence*

We turn finally to the additions to tax for negligence. Under section 6653(a), if any part of an underpayment of income tax is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. Respondent determined additions to tax for negligence against petitioners Forseth, Formsma, Bramblett, and Easterling relative to their 1980 tax year.[44] As to such determinations, petitioners bear the burden of proving error. *Enoch v. Commissioner*, 57 T.C. 781 (1972). In each case, we are persuaded on the facts that petitioners have failed to meet that burden.

We find it highly significant that each petitioner executed a written document authorizing LMEI/LMEC to trade on his behalf on a discretionary basis *without any dollar limitation.* Forseth, Formsma, and Easterling testified that they never told LMEI/LMEC how much they were prepared to lose. Forseth testified that he anticipated earnings of $10,000 from a land sale, and it was solely this sum that he intended to invest in LMEI/LMEC, yet he at no time communicated this limitation to the London company. With dubious hyperbole, Bramblett testified that he realized that he could be "wiped out financially" by virtue of his LMEI/LMEC trading activity. Petitioner Easterling, by contrast, concluded that he was only risking a little over $200,000 on his $27,000 investment for the reason that "they could leverage you as much as eight to one." On this

---

[42]On the issue of the disallowance of fees to InterAct, respondent had the burden of proof as to petitioner Easterling. See note 4 *supra.* Rule 142(a). Respondent has met that burden.

[43]Having decided that the instant transactions were factual shams, we need not, of course, reach petitioners' additional argument that they were entered into for profit, or respondent's alternative argument that any losses allowed should be capital rather than ordinary in nature.

[44]According to respondent, his failure to determine additions to tax against the remaining petitioners was due to an "oversight."

record, however, it is clear neither what Easterling meant by this nor how he might have been assured thereby that his losses would be so limited.

As we have found, petitioners Forseth and Easterling had at least some prior exposure to trading in commodities, and petitioner Bramblett had invested in the stock market for more than 20 years. Despite this experience and their apparently unlimited exposure, however, all four petitioners were remarkably oblivious to the operations of LMEI/LMEC. Forseth was totally unaware of the company's procedures. Neither Bramblett nor Formsma knew how LMEI/LMEC computed its margin requirements; they merely sent in what they were told to send. Formsma admitted that he did not know whether InterAct or anyone else was monitoring his account after he had opened it and trading had begun. None of the four petitioners was aware how the London company computed the alleged losses or the prices at which his positions were liquidated. Bramblett just "assumed" they were "honest people." Despite Easterling's lack of awareness concerning LMEI/LMEC's computation of his losses, when asked why he had not invested in a regulated, domestic futures exchange instead, he professed a confidence in the London company which we find dubious and groundless, as follows:

I knew of no other trading market in the United States that might have the expertise that the people in London would have—and hopefully the ability to exercise orders more quickly and more knowlegeably [sic].

While the four petitioners claimed that they followed the advice of their tax and financial advisers and InterAct promoters, persuasive evidence of any real research into the reputation and trading activities of LMEI/LMEC, or of any reasonable basis to support their alleged reliance on such advice is wholly lacking on this record.

Finally, we are persuaded that all four petitioners, at a minimum, acquiesced in the adoption by their 1980 return preparers of certain instructions for reporting losses from their transactions with LMEI/LMEC in such a way that the nature of such losses would be obscured. This conclusion results, first, from the similarity of the language used by each petitioner to report such losses to the exemplary language provided in the InterAct information packet, neither of which

makes reference to LMEI/LMEC or the unregulated, overseas exchange on which the cancellations purportedly occurred;[45] and second, from the failure of each petitioner to check the "yes" box in response to the foreign account question on Schedule B of his 1980 return. Moreover, at least as to the three petitioners who utilized the services of InterAct, our conclusion is strengthened by Ketron's frank admission at trial that "we educated [clients] regarding the way that we understood the way certain profits or losses could be reported."

In view of the foregoing considerations, we sustain respondent as to the additions to tax for negligence.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*[46]

---

[45]In this regard, it is interesting to note that Bramblett did not use the services of InterAct.

[46]While we have found for respondent on all issues before the Court, certain stipulated concessions by respondent concerning the method of computing petitioners' tax liabilities and respondent's pleadings for increased deficiencies in a number of cases, call for entry of our decision under Rule 155.