WILLIAM C. HAHN and ELLA J. HAHN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hahn v. Commissioner
Docket No. 29461-85
United States Tax Court
T.C. Memo 1990-43; 1990 Tax Ct. Memo LEXIS 43; 58 T.C.M. (CCH) 1294; T.C.M. (RIA) 90043; January 23, 1990
Peter R. Stromer, for the petitioners. David H. Peck, Steven B. Jacobs, Jeffrey N. Kelm and Albert Balboni, for the respondent. JACOBS
MEMORANDUM OPINION JACOBS, Judge: Respondent determined deficiencies in petitioners' Federal income tax for 1979 and 1980 in the respective amounts of $ 4,587 and $ 18,814, plus additions to tax under section 6653(a)[1] in the respective amounts of $ 229 and $ 941. By amended answer, respondent determined that the entire deficiency was attributable to tax motivated transactions and thus seeks increased interest pursuant to section 6621(c). [2]
The issues for decision are: (1) whether respondent properly disallowed *45 losses claimed by petitioners in connection with a government securities arbitrage program marketed by Commodity Management Systems, Inc., (2) whether respondent properly disallowed a loss and tax credit claimed by petitioners as a result of their investment in Professional Software Marketing, Ltd., (3) whether petitioners are liable for additions to tax pursuant to section 6653(a) for negligence or intentional disregard of rules and regulations, and (4) whether petitioners are liable for additional interest pursuant to section 6621(c) for an underpayment attributable to a tax motivated transaction. Some of the facts have been stipulated and are so found. So much of the stipulation of facts and exhibits attached thereto as we find relevant are incorporated herein by this reference. Petitioners, husband and wife, resided in Los Altos Hills, California, at the time their petition in this case was filed. During the years in issue, both were employed by Lockheed Missiles & Space Company, Inc. -- William Hahn was employed as an engineer, and Ella Hahn as a typist. Both are college graduates. Relying upon the advice of Charles Reitz (Reitz), a financial and tax adviser, petitioners *46 invested in a number of tax shelters over a period of years. This case involves two of those investments. In 1979, petitioners invested $ 4,650 in a trading program involving the arbitraging of government securities marketed by Commodity Management Systems, Inc. (CMSI); in 1980, they invested $ 5,000 in Professional Software Marketing, Ltd. (PSM), a limited partnership organized to purchase and market a computer software program. Petitioners reported losses of $ 20,438 and $ 3,932 [3] on their respective 1979 and 1980 tax returns in connection with their involvement in the CMSI government securities arbitrage program, which losses respondent disallowed. On their 1980 return, petitioners claimed entitlement to a $ 4,950 loss and an $ 8,934 investment tax credit in connection with their investment in PSM; respondent disallowed both the claimed loss and tax credit. At the outset, we note that respondent's determinations *47 are presumptively correct, and petitioners bear the burden of proving their entitlement to the deductions and credit claimed. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). To avoid repetition, we have combined our findings of fact and opinion for each issue to be decided. I. CMSI's Government Securities Arbitrage Program
In late 1978, CMSI began promoting an arbitrage program involving government securities in order to obtain tax benefits. (Prior to that time CMSI had been a commodity trading advisor). Such program was designed to produce (1) an ordinary loss in the current year (e.g., 1979) by selling short a Treasury bill due to mature by the end of such year and holding such short position until the bill matured, and (2) a capital gain (in an amount approximating the amount of the ordinary loss produced as aforesaid) in the following year (e.g., 1980) by purchasing a Treasury note due to mature in said subsequent year (e.g., 1980) and holding the note to maturity. [4] In those cases where the Treasury note was held for less than one year (which would result in the gain generated therefrom to be characterized as short-term capital gain), *48 the gain from the Treasury note would be converted to long-term capital gain through the trading of commodity straddles. At all relevant times, CMSI had but two employees -- Peter Lauterbach, its president, and *49 Nancy Sellstrom, Lauterbach's secretary. CMSI generated business through customer referrals from financial advisers, investment brokers, accounting firms, and newspaper advertisements which touted the tax consequences of trading in government securities. During 1979 and 1980, CMSI had between 130 to 150 customers. At all relevant times, CMSI obtained its inventory of government securities exclusively from Donaldson, Lufkin & Jenrette Securities Corporation (DLJ). (CMSI used the securities obtained from DLJ in its trades with its customers). The trading activity between CMSI and DLJ was reflected in confirmations issued by DLJ to CMSI. CMSI internally recorded its trades with DLJ in an omnibus account. The amount of government securities recorded in CMSI's omnibus account far exceeded in amount that which CMSI acquired from DLJ. Each of CMSI's customers, or the customer's adviser, informed Lauterbach as to the amount of tax loss the customer desired. Lauterbach thereafter would determine margin requirements and CMSI's management fee on the basis of the customer's tax loss objective. CMSI's customers were required to pay twenty five percent (25%) of their tax loss objective *50 to CMSI. Forty percent of such payment (or 10% of the amount of the desired tax loss) would be for CMSI's management fee; the remaining sixty percent (60%) (or 15% of the amount of the desired tax loss) would be designated as a margin deposit. After CMSI received the customer's signed subscription agreement and check, Lauterbach grouped customers together based upon their investment objectives, i.e., customers desiring ordinary losses in year one and capital gains in year two would be grouped together. Once a sufficient number of customers with like objectives had been grouped, CMSI began the trading process. As Lauterbach testified, CMSI would place an order with DLJ to acquire government securities which CMSI then could trade to its customers; however, the order with DLJ was not necessarily executed on the placement date of the order. Upon execution of the order, DLJ would orally confirm with Lauterbach the quantity and price of the security which was bought or sold, as well as the security's CUSIP number. [5] Lauterbach would write the information on a yellow legal pad and give it to Sellstrom for processing. From the information provided by Lauterbach, Sellstrom prepared *51 computer keypunch cards which were delivered to CMSI's outside computer service, Software Resources. Software Resources would then generate confirmation statements to be mailed to CMSI's customers. These internal client confirmations were generated based upon the information provided by Lauterbach, rather than written confirmations which DLJ would subsequently provide to CMSI. Lauterbach was solely responsible for monitoring the written confirmations from DLJ; Sellstrom did not check the DLJ written confirmations against the CMSI generated customer confirmations. CMSI required its customers to make a minimum investment of $ 25,000 (which would produce an $ 100,000 tax write-off). This minimum amount was in excess of the amount petitioners wished to invest. Accordingly, petitioners' money was invested with two other persons (named Rosen and Cary) through a managed pooled trading account established by Reitz through his corporation, Western Financial Management (WFM). (The pooled account was known as the Rosen, Hahn and Cary account.) In November 1979, petitioners wrote two checks to WFM in the respective *52 amounts of $ 2,000 and $ 4,650. WFM kept the $ 2,000 check as its management fee; petitioners' $ 4,650 check was forwarded to CMSI. Of the $ 4,650 received on behalf of petitioners, CMSI allocated $ 1,860 as its management fee and the $ 2,790 balance was designated as a "margin deposit." (Rosen and Cary deposited $ 25,000 and $ 11,250, respectively, into the pooled account; thus, the aggregate amount in the Rosen, Hahn and Cary account was $ 40,900.) The 1979 loss objective for the Rosen, Hahn and Cary account was $ 163,600 which was to be offset by a like capital gain in 1980. Petitioners' share of the pooled account was 11.37 percent and their share of the 1979 loss objective was $ 18,600 ($ 163,600 X 11.37%). CMSI's omnibus account reflected that CMSI held short positions in three Treasury bills maturing on December 13, 20, and 27, 1979, respectively. The face amount of these bills and the amount allocated to CMSI's customers are as follows: Maturity
Face  Allocation to
Date
Amount
Clients
12/13/79
$ 3,866,120,000
$ 3,784,770,000
12/20/79
$ 3,173,130,000
$ 3,153,030,000
12/27/79
$ 2,264,510,000
$ 2,244,810,000
CMSI received Treasury bills *53 (with respect to which it held a short position) from DLJ pursuant to reverse repurchase agreements. [6]
Confirmations from DLJ to CMSI reflect that the total face amount for each of the three Treasury bills sold short by CMSI was $ 200,000,000. Thus, the actual face amount of each Treasury bill in which CMSI held a short position was substantially less than the amount reflected in CMSI's omnibus account. On December 3, 1979, CMSI (as principal) allegedly entered into the following short sale Treasury bill transactions with the Rosen, Hahn and Cary account in order to produce a $ 163,399 loss: Maturity
Face  Sales   1979 Loss if
Date
Amount
Proceeds
Held to Maturity
12/13/79
$ 18,480,000
$ 18,425,587
$  54,413
12/20/79
$ 11,120,000
$ 11,065,388
$  54,612
12/27/79
$  7,850,000
$  7,795,626
$  54,374
$ 163,399
*54 The short positions so obtained by Rosen, Hahn and Cary were allegedly held until the Treasury bills matured. Of the $ 163,399 loss generated from these transactions, $ 18,578 was allocated to petitioners ($ 163,399 X 11.37%). Prior to December 3, 1979, CMSI had depleted its entire $ 200,000,000 position in each of the three Treasury bills by entering into transactions with customers other than Rosen, Hahn and Cary. Thus, as of December 3, 1979, CMSI did not hold a position in any of the three Treasury bills which it could have sold or traded to Rosen, Hahn and Cary. Hence, the December 3, 1979 alleged trade between CMSI and Rosen, Hahn and Cary did not actually occur (i.e., said trade was fictitious). On December 4, 1979, CMSI allegedly sold to the Rosen, Hahn and Cary account a Treasury note maturing on March 31, 1980 having a $ 10,470,000 face value. As of December 4, 1979, CMSI did not hold a position in the Treasury note allegedly sold to Rosen, Hahn and Cary; thus, said trade was fictitious. This fictitious trade generated a fictitious net gain in 1980 in the amount of $ 160,024 (which was used to offset the fictitious 1979 loss of $ 163,399). Petitioners' allocable *55 share of this fictitious gain was $ 18,195 ($ 160,024 X 11.37%). As with the short sale of the Treasury bills, the amount of gain from this Treasury note transaction could be precisely calculated on the date the trade allegedly occurred. Respondent advanced several arguments to support his disallowance of the 1979 and 1980 losses claimed by petitioners in connection with their involvement in the CMSI government securities arbitrage program. One such argument is that the transactions between CMSI and petitioners were shams. We agree. [7]
Petitioner William Hahn testified that he did not know that CMSI's government securities transactions were fictitious. Although his testimony was credible, his ignorance does not change the true nature of CMSI's activities. Accordingly, petitioners are not entitled to deduct *56 the purported losses they incurred as clients of CMSI. Forseth v. Commissioner, 85 T.C. 127, 165 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. sub nom. Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987), affd. without published opinion sub nom. Bramblett v. Commissioner, 810 F.2d 197 (5th Cir. 1987), affd. sub nom. Enrici v. Commissioner, 813 F.2d 293 (9th Cir. 1987), affd. sub nom. Biermann v. Commissioner, 800 F.2d 266 (11th Cir. 1986); Price v. Commissioner, 88 T.C. 860 (1987). Since CMSI's transactions with the Rosen, Hahn and Cary account were fictitious, it follows that petitioners' alleged 1980 gain with respect thereto is not taxable. Glass v. Commissioner, 87 T.C. 1087, 1177 (1986), affd. sub nom. Killington v. Commissioner, 864 F.2d 1214 (5th Cir. 1989), affd. sub nom. Keane v. Commissioner, 865 F.2d 1088 (9th Cir. 1989), affd. sub nom. Kirchman v. Commissioner, 862 F.2d 1486 (11th Cir. 1989), affd. sub nom. Ratcliff v. Commissioner, 865 F.2d 97 (6th Cir. 1989), *57 affd. sub nom. Yosha v. Commissioner, 861 F.2d 494 (7th Cir. 1988), affd. sub nom. Harrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988), affd. sub nom. Friedman v. Commissioner, 869 F.2d 785 (4th Cir. 1989). II. Computer Software Partnership Investment
PSM was a limited partnership formed in the latter part of 1980 to acquire and commercially exploit a computer software system being developed by Maynard Programming Services, Ltd. (Maynard). The software was to consist of an accounting package to be used by physicians, dentists, and veterinarians. PSM agreed to purchase the software from Maynard for $ 7,400,000, $ 370,000 of which was payable at closing and the balance (evidenced by a nonrecourse note) was payable in installments over a 10-year period. PSM also agreed to enter into a marketing agreement with Computer Supermarket, Inc. (CSI), whereby CSI would be granted the exclusive right to market the software. Robert Castle (Castle) was the initial general partner of PSM and the president of CSI. Limited partnership units in PSM were sold through a private placement memorandum; 410 units were offered *58 for sale. The subscription price for each unit was $ 1,000, with a 5 unit minimum purchase requirement. WFM solicited investors on behalf of PSM's general partner. The private placement memorandum disclosed that in 1979, Reitz consented to the entry of an injunction in an action brought by the Securities and Exchange Commission without admitting liability. Petitioners invested $ 5,000 and executed a subscription agreement for 5 PSM limited partnership units in September 1980. Through the private placement memorandum, petitioners were advised that they would receive tax deductions as well as a tax credit as a result of their investment in PSM and that the claiming of such deductions and tax credit on their returns might be challenged by the IRS. In an undated letter from Castle, petitioners were advised that their subscription had been accepted and were given a copy of an updated progress report prepared by Maynard and dated December 8, 1980. In the progress report from Maynard, the status of four different software systems was reviewed. Although the letter details certain percentages of completion, no system had been fully completed as of the date of the progress report.
*59 Respondent began an audit of PSM in March 1983. Based upon a review of its national computer files, respondent determined that for its 1980 taxable year, PSM had filed three extensions but never filed a partnership tax return. At the time of the tax audit, Reitz had succeeded Castle as PSM's general partner. Respondent issued a summons upon Reitz to produce various business records of PSM. At a meeting with one of respondent's revenue agents, Reitz produced some bank records and a list of PSM partners. He failed to produce the other items which were summoned despite repeated requests to do so from the revenue agent. Undaunted by his experience with Reitz, the revenue agent issued a summons on four banks where PSM maintained accounts. PSM's 1980 bank records reflected deposits from capital contributions aggregating $ 430,000, as well as an $ 11,000 deposit from WFM. Another $ 11,400 in capital contributions was deposited in 1981. The following withdrawals were made from PSM's bank accounts in 1981: Recipient
Amount
Maynard
$ 281,000
WFM
$  89,000
Castle
$  27,000
Christensen [8]
$   4,000 - $ 5,000
*60 The $ 11,400 deposit made in 1981 was paid out to Maynard, WFM and Professional Software Services. An IRS engineer made repeated attempts to acquire materials from Maynard relating to PSM's software (i.e., master tape, hard copy printouts and user manual) in order to value the software; however, such efforts were unsuccessful. In a continuing attempt to obtain copies of the software, the IRS engineer telephoned Reitz. Reitz informed the IRS engineer that the software was obsolete and had never been distributed or placed on the market. Depreciation deductions are available only with respect to property used in a trade or business or held for the production of income. Section 167(a). An investment tax credit is available only for property with respect to which depreciation is allowable. Moreover, the property giving rise to the investment tax credit and depreciation deductions must actually be placed in service. Sections 1.46-3(d), 1.167(a)-10(b) and 1.167(a)-11(e), Income Tax Regs.
Petitioners failed to prove that the software was placed in service in 1980. Thus, we sustain respondent's *61 disallowance of the deductions and credit claimed by petitioners as a result of their investment in PSM. [9]
III. Section 6653(a) Addition to Tax
Section 6653(a) provides that if any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to five percent of the underpayment. If section 6653(a) (as applicable to the years at issue) applies, the addition to tax is calculated based upon the entire underpayment of tax. Commissioner v. Asphalt Products Co., 482 U.S. 117 (1987). Negligence has been defined as the lack of due care or the failure to do what a reasonably prudent person would do under the circumstances. Freytag v. Commissioner, 89 T.C. 849, 887 (1987). *62 Petitioners contend that their reliance upon the investment advice of Reitz satisfies the reasonably prudent person standard. We disagree. Reliance solely on professional advice is not an absolute defense, and petitioners must show that such reliance is reasonable. Freytag v. Commissioner, 89 T.C. at 888. Petitioners failed to show that Reitz had either experience or expertise in the types of investments they made. Moreover, we are troubled by the obvious relationship between Reitz, WFM, CMSI, and PSM. Petitioners knew that Reitz, through WFM, was brokering government securities transactions for CMSI; they also knew that he was soliciting investors for PSM and that Reitz, in 1979, had consented to an injunction with respect to an action brought by the Securities and Exchange Commission. Further, other investments recommended by Reitz had resulted in the disallowance of deductions taken with respect thereto. Petitioners failed to prove that they exercised the requisite due care; accordingly, we sustain respondent's determination with regard to the additions to tax under section 6653(a). IV. Section 6621(c) Additional Interest
By amendment to the *63 answer, respondent asserted the applicability of section 6621(c) dealing with interest on a substantial underpayment attributable to a tax motivated transaction. Respondent raised this issue for the first time in the answer; therefore, he bears the burden of proof. Rule 142(a). Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate established under section 6621(b) where there is a "substantial underpayment" (an underpayment of at least $ 1,000) in any taxable year "attributable to 1 or more tax motivated transactions." This section applies only with respect to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). "Tax motivated transactions" are defined, inter alia, as "any sham or fraudulent transaction." Section 6621(c)(3)(A)(v). *64 We have found that the government securities arbitrage transactions were fictitious (i.e., sham transactions). Accordingly, petitioners' underpayment resulting therefrom is attributable to a tax motivated transaction. Freytag v. Commissioner, 89 T.C. 849, 887 (1987); Cherin v. Commissioner, 89 T.C. 986, 1000 (1987). As to petitioners' investment in PSM, we disallowed the claimed depreciation deductions and investment tax credit based upon petitioners' failure to prove that the software had been placed in service in 1980. This holding does not come within the purview of the types of transactions that would trigger the imposition of additional interest under section 6621(c). See Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). Accordingly, petitioners' underpayment arising from their PSM investment did not result from a tax motivated transaction. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts are rounded. ↩
2. Subsec. (d) of sec. 6621 was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. Herein, the reference to section 6621↩ is as redesignated and amended.
3. The $ 3,932 loss reported on petitioners' 1980 tax return is a net figure, comprised of a $ 22,127 short-term capital loss and an $ 18,195 short-term capital gain.↩
4. Treasury bills are short-term debt instruments, regularly issued by the U.S. Treasury Department for periods of 3 months, 6 months or 1 year. They are issued at a discount from their face value, and at maturity the face amount of the bill is paid to the holders thereof. The Treasury Department also issues longer term notes and bonds. Prior to the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 322, straddle transactions involving government securities (such as the one promoted by CMSI) afforded certain tax advantages due to the fact that (1) an obligation of the United States issued after February 28, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding 1 year from the date of issue (e.g., a Treasury bill) was not considered a capital asset, section 1221(5), and (2) gain on Treasury bills and notes was not recognized until the bills (or notes) matured, were sold or otherwise disposed of. Section 454(a).↩
5. The CUSIP number identifies the particular government security issue.↩
6. Repurchase agreements and reverse repurchase agreements are frequently used by dealers in government securities, financial institutions, and others in order to borrow securities. Because the securities were received by CMSI from DLJ pursuant to reverse repurchase agreements (i.e., as collateral), CMSI's transactions with DLJ were considered short sales rather than closed and completed purchases and sales.↩
7. Assuming arguendo that the transactions were not fictitious, we also agree with respondent's contention that the transactions between CMSI and its customers lacked economic substance. The amount of securities purportedly bought and sold by CMSI on behalf of its customers was determined by the desired tax loss of CMSI's fees and the amount of the margin deposit.↩
8. Christensen is an attorney. The record does not reveal the nature of services rendered, if any, by him.↩
9. In Ronnen v. Commissioner, 90 T.C. 74↩ (1988), we held that computer software is not tangible personal property or other personal property eligible for the investment tax credit.