KERRY W. ILLES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Illes v. Commissioner
Docket No. 9616-90
United States Tax Court
T.C. Memo 1991-449; 1991 Tax Ct. Memo LEXIS 498; 62 T.C.M. (CCH) 728; T.C.M. (RIA) 91449; September 16, 1991, Filed *498 Decision will be entered for the respondent. Mark E. Gammons, for the petitioner. Dawn M. Krause, for the respondent. FAY, Judge. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION This case has been assigned to Chief Special Trial Judge Marvin F. Peterson pursuant to the provisions of section 7443A(b) and Rules 180, 181, and 183. All section references are to the Internal Revenue Code as amended and in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the Chief Special Trial Judge's opinion, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PETERSON, Chief Special Trial Judge: Respondent determined a deficiency in petitioner's income tax and additions to tax as follows: Year
Deficiency
Additions to Tax
1985
$ 34,908.00
Sec. 6653(a)(1)
$ 1,745
Sec. 6653(a)(2)
*
Sec. 6659(a)
5,698
Sec. 6661(a)
3,979
After concessions by petitioner, *499 the issues remaining for decision are (1) whether petitioner is entitled to a deduction under section 165(c)(2) for cash expenditures made for an investment which was an economic sham; and (2) whether petitioner is liable for additions to tax pursuant to sections 6653, 6659, and 6661, and for increased interest pursuant to section 6621(c). In his Answer, respondent has affirmatively raised the issue of whether petitioner is liable for increased interest pursuant to section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioner resided in Medina, Ohio, when the petition in this case was filed. During 1981, Structured Shelters, Inc. (SSI), marketed an investment entitled Children's Classic Series (1981 Record Promotion). This promotion involved the leasing of master recordings of children's stories for the purpose of producing record albums, described in detail in Rybak v. Commissioner, 91 T.C. 524 (1988). SSI used sales agents, called chartered representatives, to market various tax motivated investments, including the 1981 *500 Record Promotion. Thomas A. Graham (Mr. Graham) was a chartered representative of SSI. The master recordings used in the Children's Classic Series were purchased by Oxford Productions (Oxford) for $ 454,120. The purchase agreement required a cash payment in the amount of $ 7,000 and the execution of a nonrecourse note in the amount of $ 447,120. The cost to produce each master recording was $ 1,635.50. Oxford leased the master recordings to investors of the 1981 Record Promotion for an 8-year term. The lease required an advance rental payment of $ 10,000 in cash plus 25 percent of all gross revenues during the lease period. A part of the 1981 Record Promotion included a distribution agreement between the investors and Aim Record Distribution (Aim) which provided that Aim would produce and market the records. The investors agreed to pay Aim $ 2,500 cash plus 10 percent of the gross receipts from record sales. Of the $ 2,500 payment, 15 percent was allocated to the cost of producing the record album jacket. Aim developed artwork for the album jackets for the 1981 Record Promotion investors. During 1984, SSI, on behalf of the 1981 Record Promotion investors, sold the rights *501 to reproduce the artwork and to use the titles of the record albums to Sonya, Inc. (Sonya), for $ 100,000 for each title. The purchase price consisted of a cash payment of $ 10,000, the assumption of a $ 6,000 note, and the payment of the $ 84,000 balance from future sales of children's cassette tapes. The $ 100,000 sales price was an arbitrary figure which had no relationship to the value of the right to use the titles sold to Sonya. Neither SSI nor the 1981 Record Promotion investors had the exclusive rights to the record titles or to the artwork sold to Sonya. Graham and his spouse owned 65 percent of the stock in Sonya. During 1984, SSI and Graham began to market an investment called Children's Classics Audio Cassettes (CCAC). There were two phases to this program. The first phase involved the production of master recordings (CCAC Production Phase) using the titles and artwork purchased by Sonya from the 1981 Record Promotion investors. The second phase involved leasing the master recordings (CCAC Lease Phase) from the CCAC Production Phase investors to produce cassette tapes. An integral part of the scheme was Sonya's sale in December 1984 to the CCAC Production Phase *502 investors (1984 CCAC Production Phase) of the right to reproduce the artwork and to use the record titles which it had purchased from the 1981 Record Promotion investors. The sales price was $ 103,000 for each title. The sales agreement required a cash payment of $ 13,000 with the balance due of $ 90,000 to be paid within 5 years from future sales of cassette tapes. Each CCAC Production Phase investor entered into an agreement with Skeets Music (Skeets) under which Skeets agreed to produce the master recordings and artwork for $ 20,000, of which $ 5,000 was paid in cash and the balance was to be paid from future sales of cassette tapes. Also, a marketing agreement was entered into with Marketing Complex, Inc. (MCI) to develop an advertising plan for the cassette tapes. The investors agreed to pay MCI $ 7,500, of which $ 1,500 was paid in cash, and a $ 6,000 promissory note due in 5 years was executed for the balance due. During 1984, the CCAC Production Phase investors leased to the CCAC Lease Phase investors (1984 Lease Phase) the right to produce cassette tapes from the master recordings developed for the 1984 CCAC Production Phase investors. The lease was for a term of 5 *503 years and required the lessee to pay $ 1 each for a minimum of 10,000 tapes. A cash payment of $ 2,500 was made and the balance of $ 7,500 was due in 5 years. The 1984 CCAC Lease Phase investors entered into an agreement with MCI to develop an advertising plan. The investors agreed to pay MCI $ 7,500, of which $ 1,500 was paid in cash and a $ 6,000 promissory note due in 5 years was executed for the balance due. During 1985, Sonya sold additional record titles and artwork to CCAC Production Phase investors (CCAC 1985 Production Phase) for $ 115,000 per title. The agreement provided for a cash payment of $ 25,000 with the remaining balance due of $ 90,000 to be paid within 5 years from the future sales of cassette tapes. Included in the sale price was the production cost of $ 5,000 which Sonya paid directly to Skeets. None of the investors entered into production agreements to produce master recordings. The 1985 CCAC Production Phase investors entered into an advertising agreement with MCI to develop an advertising plan. The investors agreed to pay MCI $ 8,000, of which $ 2,000 was paid in cash and a $ 6,000 promissory note due in 5 years was executed for the balance due. *504 During 1985, the CCAC 1984 and 1985 Production Phase investors leased to the CCAC Lease Phase investors (1985 CCAC Lease Phase investors) the right to produce cassette tapes from the master recordings purportedly developed for the 1984 and 1985 CCAC Production Phase investors. The lease was for a period of 5 years and required the lessee to pay $ 1.67 each for a minimum of 10,000 tapes. A cash payment of $ 4,175 was paid and the balance of $ 12,525 was to be paid from future sales of cassette tapes during the term of the lease. The 1985 Lease Phase investors entered into an agreement with MCI to develop an advertising plan. The investors agreed to pay MCI $ 8,000, of which $ 2,000 was paid in cash, and a $ 6,000 promissory note due in 5 years was executed for the balance due. The cassette tapes and artwork were primitive, of very poor quality, and clearly substandard to cassette tapes sold in the customary retail market. As of the date of trial, there had been no sales of such cassette tapes. Because of their poor quality, it was highly unlikely that there would ever be a market for cassettes tapes produced from the master recordings leased by the investors. Under these circumstances *505 the master recordings, leases, and artwork had no commercial value. The total amount of cash invested by the 1984 CCAC Production Phase investors was $ 19,500 for each master recording. The total amount of projected tax benefits for each investor was between $ 115,000 and $ 119,000. The total amount of cash invested by the 1985 CCAC Production Phase investors was $ 27,000 for each master recording. The total amount of projected tax benefits for each investor was $ 126,300. The total amount of cash invested by the 1984 CCAC Lease Phase investors was $ 4,000 for each lease. The total amount of projected tax benefits for each investor was $ 17,500. The total amount of cash invested by the 1985 CCAC Lease Phase investors was $ 6,175 for each lease. The total amount of projected tax benefits for each investor was $ 24,700. During 1985, petitioner entered into an agreement with Sonya, Inc., to purchase for $ 115,000 the rights for the limited use of the artwork and the title for the story of "Renowned Bedtime Stories" for the production of a master recording. Petitioner made a down payment of $ 25,000, with the balance of $ 90,000 due in 5 years. Petitioner also entered into an *506 advertising agreement with MCI for $ 8,000, of which $ 2,000 was paid in cash. Petitioner executed a $ 6,000 promissory note payable from future sales of cassette tapes and any balance was due in 5 years. Petitioner expected to receive tax deductions in the amount of $ 119,700 and an investment tax credit of $ 6,000 from his cash investment of $ 27,000. During 1985, petitioner entered into an agreement with Sonya, Inc., to lease a master recording entitled "Jokes and Riddles" to produce cassette tapes. Petitioner agreed to an advance rental payment of $ 16,700, of which $ 4,175 was paid in cash and the balance was due in 5 years. Petitioner entered into an advertising agreement with MCI for $ 8,000, of which $ 2,000 was payable in cash, and petitioner executed a $ 6,000 promissory note payable from future sales of cassette tapes and any balance was due in 5 years. Petitioner expected to receive tax deductions for advertising and lease expense in the amount of $ 24,700 from his cash investment of $ 6,175. At the time of the investments in the master recording and the lease, petitioner had no background in or knowledge of the record or tape cassette business. Petitioner did *507 not make any investigation concerning the nature or the profitability of the CCAC investments and accepted at face value Mr. Graham's statement that the CCAC investments were suitable for his retirement program. He failed to review the various documents he signed and did not negotiate any of the contract terms. Petitioner did not investigate the experience or the financial background of any of the entities involved in the CCAC transactions to determine whether such entities had the capability to produce and distribute cassette tapes in the retail market. Petitioner made no attempt to obtain an appraisal of the master recording or the lease, or make any other investigation to determine their values. Petitioner made no attempt to either verify Mr. Graham's tax advice with an independent tax authority, or verify whether Mr. Graham had any experience in the recording business or was knowledgeable in investment or tax matters. Petitioner has been a self-employed architect for many years and had little or no experience in tax matters. Petitioner's decision to invest in the 1985 CCAC Production Phase and 1985 CCAC Lease Phase was based on the promised tax benefits and not on an actual *508 and honest profit motive. OPINION Petitioner admits that the investments made in the 1985 CCAC Production Phase and the 1985 CCAC Lease Phase had no economic substance and agrees that he is not entitled to any tax credits or deductions based on these investments. However, petitioner contends that he is entitled to deduct the cash payments made for these investments under section 165(c)(2) on the ground that the losses were incurred in a transaction entered into for profit. Although admitting that the transactions were economic shams, he contends that he had no knowledge at the time he entered into the transactions that the investments lacked economic substance. Petitioner contends that he felt that he needed additional money to fund his retirement, and on the advice of Mr. Graham, used some of his retirement savings for the CCAC investments with the hope of receiving a substantial monetary return. Therefore, petitioner argues that tax motivation was incidental to the CCAC investments because he felt that the investment would have a 20-to-1 return from the sale of cassette tapes which would be sufficient to meet his investment needs without regard to any tax benefits. Further, *509 petitioner argues that because of his lack of knowledge in investments and tax planning, it is clear that he relied on the reputation of Mr. Graham, as an expert in investment matters, that there would be substantial earnings and profits from the sale of cassette tapes. Respondent argues that petitioner has failed to show that a loss was sustained, or the amount of any loss as required under section 165(c)(2). In addition, respondent contends that petitioner has failed to show that he had a profit motive when he entered into the CCAC transactions. The transactions involved in the instant case are a continuation of the tax shelter promotion scheme by SSI concerning master recordings of children's records described in detail in Rybak v. Commissioner, 91 T.C. 524 (1988). In the original 1981 promotion the investors produced master recordings for the alleged purpose of producing and distributing records in the children's retail market which the Court found was an economic sham. In the instant case petitioner indirectly acquired the right to use song titles and artwork from investors in the 1981 Record Promotion to produce a master recording and leased a master *510 recording to produce cassette tapes from an investor who also acquired the song title and artwork indirectly from an investor in the 1981 Record Promotion. To resolve the question of whether petitioner had a profit motive, we must look to all of the facts and circumstances. Fox v. Commissioner, 82 T.C. 1001, 1022 (1984). Petitioner has the burden of proof to show such profit motive. Rule 142(a). The facts in this case are essentially the same as set forth in Rybak v. Commissioner, supra. The only material difference is that in the instant case petitioner purchased a master recording through SSI to produce children's cassette tapes rather than records. Petitioner also leased a master recording to produce children's cassette tapes. Petitioner admits that these transactions were without economic substance the same as in the Rybak case. As to petitioner's profit motive we come to the same conclusion as we did in Rybak, that the investments were made solely for the tax benefits. Petitioner admitted as much when he testified that the tax savings from the CCAC transactions would allow him to make the initial investments. When *511 petitioner entered into the transactions he expected to receive at least a 2-to-1 payback based on the investment credit and tax deductions no matter what happened to the sale of cassette tapes. Petitioner executed contracts without negotiation. The value of the master recordings was only a fraction of the purchase price, and most of the purchase and lease payments were deferred and would only be paid from sales revenues. At the time of the investments petitioner had no background or knowledge of the record or cassette tape business. In spite of this lack of background or experience, he made no effort to consult with anyone with experience in the record and cassette tape industry, or to obtain appraisals to determine whether the investments had substance and commercial viability. Petitioner may have relied on Mr. Graham, but the information received focused on the substantial tax benefits involved and not on the advisability of investing in the recording business to produce children's cassette tapes. These facts lead us to the conclusion that petitioner had no profit motive other than for the tax benefits. See Rybak v. Commissioner, supra at 536. There *512 is no doubt that the various master recording programs set forth above were nothing more than economic shams without a business or profit motive. The facts involved in this case show that petitioner did not have an actual and honest objective of making a profit, but entered into the transactions for the sole purpose of obtaining income tax benefits. Even if we were to assume that petitioner had a profit motive, petitioner could not prevail in this case because the transactions lacked economic substance. See Cherin v. Commissioner, 89 T.C. 986, 993-994, (1987), where we held that the presence of an individual's profit motive does not require the recognition for tax purposes of a transaction which lacks economic substance. In Jackson v. Commissioner, T.C. Memo 1991-250, we denied a deduction for "out of pocket cash losses" on the ground that the transaction lacked economic substance even though the taxpayers may have entered into the transaction for profit. Also, in Shriver v. Commissioner, 899 F.2d 724 (8th Cir. 1990), affg. a Memorandum Opinion of this Court, the court concluded, as an alternative basis for its holding *513 that the deductions claimed were not deductible, that where there is a clear finding of a lack of economic substance it is enough, standing alone, to support a decision that a deduction is not allowable. In Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987), affg. Forseth v. Commissioner, 85 T.C. 127 (1985), the Court of Appeals held that if a transaction is a complete sham, then such niceties as whether the test (for whether a transaction is "entered into for profit") is an objective or subjective one are simply not involved. Regardless of the definition, the transaction must be bona fide before losses are deductible. For the above reasons, we sustain respondent's determination that petitioner is not entitled to a loss deduction under section 165(c)(2) for the cash payments invested in the CCAC transactions because the transactions involved lacked economic substance and were not entered into for profit. Additions to Tax
Section 6653(a)
Respondent determined that petitioner is liable for additions to tax under section 6653(a)(1) and (2). Section 6653(a)(1) imposes an addition to tax if any part of an underpayment of tax *514 is due to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) imposes an additional amount, but only with respect to the portion of the underpayment attributable to the negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner contends that he was not negligent because he placed his reliance completely on Mr. Graham, the sales representative of SSI, who petitioner felt had a good reputation in tax and investment matters. We agree that reliance on the advice of professionals may defeat a finding of negligence under certain circumstances. Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272, 283 (1976). See Coleman v. Commissioner, T.C. Memo 1990-511. Petitioner has the burden of proof to show that he was not negligent. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982). There is no evidence in this record that Mr. Graham had any experience in the record or cassette tape recording business. Petitioner made no *515 attempt to personally verify whether Mr. Graham had any such experience, or whether he was knowledgeable in investment and tax matters. Petitioner testified that he relied on Mr. Graham's reputation when he entered into the transactions. However, petitioner failed to explain the basis for his complete faith in Mr. Graham's reputation. Apparently, petitioner did not see any conflict in the fact that Mr. Graham had a financial interest in the transactions. Under these circumstances, reasonable caution dictates that further inquiry be made to verify the accuracy of the tax and investment information received. We do not believe that petitioner would have committed nearly $ 150,000 to these transactions without seeking independent advice if he were truly concerned about his investments, other than for the tax benefits involved. We find no evidence that petitioner's actions were prudent or reasonable under the circumstances of this case. Accordingly, petitioner is liable for the additions to tax for negligence as determined by respondent. Section 6659
Section 6659 imposes a graduated addition to tax whenever an individual has an underpayment of tax which equals or exceeds *516 $ 1,000 and which is attributable to a valuation overstatement. A valuation overstatement occurs when "the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Sec. 6659(c). Petitioner argues that the addition under section 6659 does not apply to this case because the underpayment is attributable to claiming an improper deduction rather that to a valuation overstatement. In the instant case, the deductions and investment tax credits were disallowed because the transactions lacked economic substance which included a finding that the property was overvalued. Where there is a lack of economic substance, section 6659 will apply because the correct basis is zero and any basis claimed in excess of that is a valuation overstatement. Rybak v. Commissioner, 91 T.C. 524, 566-567 (1988); Gilman v. Commissioner, 933 F.2d 143 (2d Cir. 1991), affg. T.C. Memo 1989-684. In affirming Gilman v. Commissioner, supra, the Court of Appeals agreed with the proposition *517 that where a deduction is disallowed due to the lack of economic substance and the lack of economic substance is due in part to an overvaluation, the deficiency is attributable to a valuation overstatement under section 6659. Gilman v. Commissioner, 933 F.2d at 151. See also Harness v. Commissioner, T.C. Memo 1991-321. Section 6661
Respondent has also determined that the addition to tax under section 6661 applies in this case. Petitioner does not dispute that there was an understatement of tax as defined in section 6661, but argues that the addition to tax should be waived on the ground that petitioner made the investment in good faith. Respondent contends that the deductions and credit claimed on petitioner's return are attributable to a tax shelter and that petitioner is liable for the addition to tax since he has failed to show that there was substantial authority for his position and that he reasonably believed his tax treatment of the items were more likely than not the proper treatment. We agree with respondent. Sec. 6661(b)(2)(C)(i). We also agree with respondent that petitioner has failed to show that respondent abused *518 his authority in not waiving the addition to tax. Mailman v. Commissioner, 91 T.C. 1079, 1084 (1988). There is no showing by petitioner of reasonable cause for the understatement and that he acted in good faith. To the contrary, we have found that petitioner was negligent in claiming the deductions and credit and failed to make a good faith effort to determine the proper tax treatment of the tax items involved. See Mailman v. Commissioner, 91 T.C. 1079 (1988). Increased Interest
In his Answer, respondent raised the issue of whether petitioner is liable for the increased interest under section 6621(c). Accordingly, respondent has the burden of proof on this issue. Rule 142(a). Petitioner contests the increased interest under section 6621(c) on the ground that he intended to make a profit on the transactions. Petitioner admits that there was a valuation overstatement of more than 250 percent, see section 6621(c)(3)(A)(i), and we have concluded that the deductions and credit were not allowable because the transactions lacked economic substance and were tax motivated. Transactions which lack economic substance or business purpose are *519 sham transactions under section 6621(c)(3)(A)(v). McCrary v. Commissioner, 92 T.C. 827, 857 (1989); Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Accordingly, respondent has met his burden of proof, and petitioner is liable for the increased interest under section 6621(c). Decision will be entered for the respondent. Footnotes
*. 50 percent of the statutory interest on $ 34,908↩