DAWN VALORE MARTIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Martin v. Commissioner
Docket No. 15314-94.
United States Tax Court
T.C. Memo 1995-448; 1995 Tax Ct. Memo LEXIS 448; 70 T.C.M. (CCH) 754; September 21, 1995, Filed *448 Decision will be entered under Rule 155. Dawn Valore Martin, pro se. Carol A. Szczepanik, for respondent. COHEN, Judge COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies of $ 9,604 and $ 6,283 in petitioner's Federal income taxes for 1990 and 1991, respectively. Respondent also determined that petitioner is liable for an addition to tax of $ 480 under section 6651(a)(1) for 1990 and penalties of $ 3,842 and $ 2,513 under section 6662(h) for 1990 and 1991, respectively. The issues for decision are whether petitioner is entitled to various deductions and credits or liable for a valuation overstatement penalty arising out of an investment in solar energy equipment. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Petitioner resided in Shaker Heights, Ohio, at the time that she filed her petition. Petitioner graduated cum laude from Barnard College, Columbia University, New York, New York, in 1978 and received a J.D. degree from New York University School of Law in 1981. During *449 1990 and 1991, she was an attorney for the Equal Employment Opportunity Commission in Washington, D.C., and earned salaries of $ 55,683 and $ 59,516 for those years, respectively. In May 1987, petitioner met Mark D. Garrett (Garrett), who represented that he was a financial planner and that his company was the Financial Network Group (FNG). Over the next several months, petitioner and Garrett became close friends and confidants. In 1989, petitioner confided in Garrett that she was in financial difficulties, having filed bankruptcy that year. Garrett, who appeared very responsible and financially stable to petitioner, offered to help. Garrett told her that he had an investment for her, stating: "I have one that ends up paying for itself immediately. You don't have to put out any initial capital because the tax savings covers." Garrett thereafter provided petitioner with a series of documents relating to Renewable Energy System (RES). Among the documents received by petitioner from Garrett was one entitled "Example of Projected Benefits for the 'Alternative' Energy System". That document represented that certain deductions and tax credits far exceeding a cash investment would be realized *450 from purchase of business energy property. No representation was made, however, concerning earnings from the property. On or about December 19, 1989, petitioner executed a variety of documents relating to the purchase of five reverse refrigeration heat units for a total purchase price of $ 50,000. She authorized FNG to be her agent in relation to the purchase. The Letter of Authorization stated in part: D. I appoint FNG as my non-exclusive agent for the purpose of leasing the Atmospheric Reverse Refrigeration Heat Unit(s) described in Paragraph B above. I request that you employ your best efforts to obtain leases which shall be for a rental amount equal to or greater than that required to satisfy the annual debt service and management fees. The lessees should be responsible for maintaining all insurance as required by the lender and as necessary to protect my interest. The leases must be with the Management Firm. E. As my agent you shall arrange for me to receive confirmation of the purchase, financing and leases with the indicated terms and conditions referenced herein. Said reports shall be received by me annually on or before January 21. F. This letter of authorization shall *451 terminate after the date on which the above referenced leases are executed or upon such earlier date as I may indicate with written notice to you. The termination of this agreement shall not effect [sic] any then existing leases obtained by you for the Atmospheric Reverse Refrigeration Heat Unit(s) owned by me. G. I agree to pay G & H Management Group an annual lease management fee of One Dollar plus TEN percent (10%) of the lease revenues received pursuant to the Atmospheric Reverse Refrigeration Heat Unit(s) leases obtained through your efforts.
Petitioner also executed a Retainer and Fee Agreement, agreeing to pay to FNG an annual fee of $ 600, and she executed a Secured Installment Promissory Note in the amount of $ 37,500 and a Note for Financed Downpayment in the amount of $ 10,000. She gave Garrett a check for $ 3,000, representing a $ 2,500 downpayment to be forwarded to RES and $ 500 as his "renegotiated" annual fee. Petitioner's tax return for 1990 was filed on August 27, 1991. On that return, she claimed $ 19,000 in depreciation and $ 600 in legal and professional fees relating to RES. She also claimed a $ 5,000 business energy investment credit, of which $ 1,021 *452 was applied to her 1990 tax liability. Petitioner's 1990 return was prepared by her former husband, who had also invested with RES. On a Form 1040X, Amended U.S. Individual Income Tax Return, dated August 19, 1992, petitioner claimed additional itemized deductions for 1990 and decreased the tax credit claimed by $ 177. On her tax return for 1991, petitioner deducted depreciation of $ 19,000 and legal and professional fees of $ 600 and claimed an energy investment credit of $ 798. Except for oral assurances from Garrett, petitioner never received confirmation of the purchase or of the leases or any reports of rental income or management fees. The tax returns filed by her did not reflect any rental income or other expenses relating to actual leases of the equipment. In 1991 and 1992, petitioner gave Garrett checks for $ 2,500 payable to RES. In February 1993, Garrett stated that he was holding petitioner's 1992 check and not turning it over to RES. Garrett then indicated that Alvin Jordon (Jordon), president of RES, was ill and was having a lot of problems and that the management of RES was very poor. Garrett subsequently returned petitioner's uncashed check to her. Respondent determined *453 that petitioner's transaction with RES lacked economic significance and was entered into primarily for tax-avoidance purposes. The deductions and credits claimed by petitioner for 1990 and 1991 were disallowed. In calculating the valuation overstatement penalty under section 6662(h), respondent determined that petitioner erroneously claimed a basis of $ 50,000 when the correct basis was zero. OPINION Petitioner conceded at trial that her 1990 return was not filed on time and that she had no facts showing reasonable cause. Thus, she is liable for the addition to tax under section 6651(a) for that year. She also conceded that she could not prove that the RES units were actually bought, placed in service, or rented, without testimony from Garrett. She was unable to secure Garrett's presence as a witness. Petitioner's presentation at trial consisted primarily of complaints about her treatment by the auditing agent of the Internal Revenue Service and her good faith reliance on Garrett as a defense to the penalties determined by respondent under section 6662(h). Petitioner has the burden of proving that respondent's determination is erroneous. Rule 142(a); Kearns v. Commissioner, 979 F.2d 1176 (6th Cir. 1992) *454 (citing United States v. Janis, 428 U.S. 433, 440 (1976)), affg. T.C. Memo. 1991-320. In view of petitioner's concessions and her failure to present any evidence refuting respondent's determinations that the transaction lacked economic substance and that her correct basis was zero rather than $ 50,000, respondent's disallowance of the depreciation deductions and tax credits must be sustained. In addition, there is no genuine dispute that the valuation overstatement exceeded 400 percent. See generally Rose v. Commissioner, 868 F.2d 851, 853-854 (6th Cir. 1989), affg. 88 T.C. 386 (1987); Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987), affg. Forseth v. Commissioner, 85 T.C. 127 (1985). Section 6662(a) imposes an accuracy-related penalty that applies to the portion of any underpayment attributable to items set forth in section 6662(b). Section 6662(b)(3) specifies as one of those items "Any substantial valuation misstatement under chapter 1." This basis for imposition of the section 6662(a) penalty is *455 distinct from negligence, which is specified in section 6662(b)(1) and defined in section 6662(c), and is also distinct from a substantial understatement of income tax, specified in section 6662(b)(2) and subject to special rules set forth in section 6662(d). Section 6662(e) provides: (e) Substantial Valuation Misstatement Under Chapter 1.-- (1) In general.--For purposes of this section, there is a substantial valuation misstatement under chapter 1 if-- (A) the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be), or
* * * * (2) Limitation.--No penalty shall be imposed by reason of subsection (b)(3) unless the portion of the underpayment for the taxable year attributable to substantial valuation misstatements under chapter 1 exceeds $ 5,000 * * *
Under section 6662(h): (h) Increase in Penalty in Case of Gross Valuation Misstatements.-- (1) In general.--To the extent that a portion of the underpayment to which this section applies is attributable to one or more gross valuation *456 misstatements, subsection (a) shall be applied with respect to such portion by substituting "40 percent" for "20 percent". (2) Gross valuation misstatements.--The term "gross valuation misstatements" means-- (A) any substantial valuation misstatement under chapter 1 as determined under subsection (e) by substituting-- (i) "400 percent" for "200 percent" each place it appears.
The only genuine issue remaining is whether petitioner is entitled to relief under section 6664(c), which provides in part: (c) Reasonable Cause Exception.-- (1) In general.--No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.
Section 6664 was added as part of Pub. L. 101-239, the Omnibus Budget Reconciliation Act of 1989, 103 Stat. 2106, 2398. The committee report, H. Rept. 101-247 at 1393 (1989), states in part: "The committee intends that the terms 'reasonable cause' and 'good faith' be interpreted under the bill as those terms are interpreted under present law." Section 1.6664-4(b), Income Tax Regs., provides *457 in part as follows: (b) Facts and circumstances taken into account-- (1) In general. The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. The most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge and education of the taxpayer. An isolated computational or transcriptional error generally is not inconsistent with reasonable cause and good faith. Reliance on an information return or on the advice of a professional (such as an appraiser, attorney or accountant) does not necessarily demonstrate reasonable cause and good faith. Similarly, reasonable cause and good faith is not necessarily indicated by reliance on facts that, unknown to the taxpayer, are incorrect. Reliance on an information return, professional advice or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable *458 and the taxpayer acted in good faith. * * *
Example (2) of section 1.6664-4(b)(2), Income Tax Regs., is as follows: Example (2). C, an individual, sought advice from D, a friend who was not a tax professional, as to how C might reduce his Federal tax obligations. D advised C that, for a nominal investment in Corporation X, D had received certain tax benefits which virtually eliminated D's Federal tax liability. D also named other investors who had received similar benefits. Without further inquiry, C invested in X and claimed the benefits that he had been assured by D were due him. In this case, C did not make any good faith attempt to ascertain the correctness of what D had advised him concerning his tax matters, and is not considered to have reasonable cause for the underpayment attributable to the benefits claimed.
This case is not unlike Illes v. Commissioner, 982 F.2d 163 (6th Cir. 1992), affg. T.C. Memo. 1991-449. The taxpayer there invested in a transaction that lacked economic substance. Seeking to avoid additions to tax under prior sections 6653(a) for negligence and 6661 for substantial *459 understatement of tax, the taxpayer argued that he relied on the professional advice of his accountant. The taxpayer presented no evidence regarding the specific advice given him by the accountant about the transaction and relied primarily on the accountant's reputation. We held, and the Court of Appeals for the Sixth Circuit agreed, that this reliance was not reasonable under the circumstances. Petitioner contends that, notwithstanding her impressive resume, she has no sophistication in tax matters and, therefore, she reasonably and in good faith relied on Garrett and on the persons who prepared her tax returns. There is nothing in the record, however, establishing that any of the persons on whom she allegedly relied was a qualified tax adviser. Although petitioner testified at length about her close personal relationship (like sister-brother) with Garrett, including that he lived in her home over a certain period of time, she provided no details concerning his education or training with respect to tax matters. She and other acquaintances of hers who knew Garrett simply relied on what he told them. Although petitioner contends that she believed that Garrett was independent of RES, *460 she knew that Garrett was receiving a fee for transacting RES business and had caused many of his clients to invest in the program. Petitioner, and presumably the other investors, paid Garrett annual fees to act as their agent for this purpose. Petitioner testified that she asked to meet Jordon, the president of RES, but Garrett told her that Jordon could not meet with all of the investors because there were so many of them and, therefore, Jordon was operating through financial advisers such as Garrett. Although Garrett, according to her testimony, originally promised to refer her to someone who was a good tax preparer, that reference never materialized. She testified that she had her former husband prepare her 1990 return because he was not as busy as she was and had invested in the same program. She provided no information concerning his background, except that he had been unemployed for several years. The paperwork presented to petitioner about RES emphasized tax benefits and contained no information about actual productive use of the equipment that she allegedly purchased. The claimed tax benefits were disproportionate to the cash investment to a degree that should have put a *461 reasonable person on notice that something was amiss. She received no corroboration of the existence or value of the property that she allegedly purchased for a minimal downpayment and long-term notes. The cases cited by petitioner, such as Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23, involve unschooled taxpayers and credentialed advisers. See 22 F.3d at 1006. Considering all of the facts and circumstances here, we are not persuaded that petitioner had reasonable cause for claiming a basis for tax purposes of $ 50,000. She has not made a showing sufficient to overcome the penalties under section 6662(h). To take account of respondent's concession on another issue, Decision will be entered under Rule 155.